MICHIGAN ASSOCIATION OF COUNTIES v DEPARTMENT OF
MANAGEMENT AND BUDGET

Docket No. 68774. Argued May 4, 1983 (Calendar No. 11).—Decided
March 19, 1984.

The Michigan Association of Counties, certain Michigan counties
and municipalities, and other associations representing Michi-
gan municipalities brought an action in the Court of Appeals
for mandamus and declaratory relief against the Department of
Management and Budget and its director, and the Governor
and State Treasurer, seeking distribution under the State
Revenue Sharing Act of certain tax monies. The distribution
had been delayed and reduced by executive order. The Court of
Appeals, Allen, P.J., and R. B. Burns and T. M. Burns, JJ.,
denied relief (Docket No. 60766). The plaintiffs appeal.

In an opinion by Justice Boyle, joined by Chief Justice
Williams and Justices Ryan, Brickley, and Cavanagh, the Su-
preme Court *held:*

Distribution of income and intangibles tax revenues to local
units of government under the State Revenue Sharing Act is
subject to reduction or delay by the Governor acting with the
approval of the House and Senate appropriations committees
whenever it appears that the actual revenues for a fiscal period
will fall below the revenue estimates on which the appropria-
tions for the period were based.

1. Sharing of income and intangibles tax revenues is autho-
rized annually by the Legislature by an appropriation act
which is subject to the constitutional mandate to reduce autho-
rized expenditures whenever it appears that the actual reve-
nues for a fiscal period will fall below the revenue estimates on
which the appropriations for the period were based. The autho-
rization for distribution in the State Revenue Sharing Act is
not a continuing appropriation, but operates as an intention to
appropriate, subject to budget changes from year to year on the
basis of revenues derived from and expenditures required by
the people. The funds are not constitutionally dedicated, and

the distribution scheme provided by the act does not fall outside the normal appropriation process. Distribution of revenue-sharing funds may be delayed in the face of cash shortages and potential budget deficits. The distribution schedule prescribed by the State Revenue Sharing Act must give way to the constitutional mandate and efforts to preserve the fiscal integrity of the state. In times of fiscal emergency, the Governor, acting with the approval of the House and Senate appropriations committees, has the authority to reduce expenditures.

2. Revenue-sharing payments are expenditures authorized by appropriations. Revenues from which the payments are to be made are estimated in specific appropriations bills and are included in the state's budget. Under the constitution, the Governor may reduce expenditures authorized by appropriations unless they are exempted. The fact that the amount of the payments will be "balanced" relative to actual revenues does not negate the Governor's power. The constitution does not require that reductions be proportionate to a decline in estimated revenue. The framers of the constitution intended that all bodies receiving appropriations would be subject to a reduction in expenditures and that the Governor would have discretion to reduce expenditures to some agencies to a greater extent than to others. The power of the Governor to reduce expenditures does not strip the Legislature of its power of appropriation. The Legislature is free to override such a reduction and provide supplemental appropriation. Furthermore, the general appropriations acts in this case not only conferred the authority to reduce all appropriations upon the Governor, but also imposed upon him the duty to make reductions where necessary.

Affirmed.

Justice Levin, joined by Justice Kavanagh, dissenting, would hold that the Governor may not withhold revenue-sharing payments allocated by the Legislature to local governments. Because revenue-sharing payments that are a predetermined percentage of actual revenues are not based on estimated revenues, they are not appropriations within the meaning of the constitutional provision authorizing the Governor to reduce expenditures if actual revenues are less than estimated revenues. Even if a revenue-sharing payment is deemed to be an appropriation based on estimated revenues, the constitution only empowers the Governor to reduce and defer *expenditures;* it does not empower him to revise acts of the Legislature or to cancel *appropriations.*

1. The power to tax and the power to appropriate are vested

in the Legislature. In the exercise of those powers, the Legislature allocated a predetermined percentage of income and other tax revenues to local units of government in a comprehensive, self-balancing, self-executing statutory scheme. Those revenue-sharing payments were not part of the annual appropriations process and were not appropriations based on revenue estimates within the scope of the constitutional provision authorizing reductions of expenditures by the Governor.

2. The enactment by the Legislature of the comprehensive, self-balancing, self-executing statutory scheme of revenue sharing and the decision not to make revenue-sharing payments part of the annual appropriations process is consistent with the language and spirit of the constitution. Reduction is permitted only where the expenditure is authorized by an appropriation based on estimated state revenues and it appears that the estimate will not be realized. Because the size of revenue-sharing payments that are a predetermined percentage of actual revenues is automatically determined by the amount of revenue, such revenue-sharing payments are self-balancing. If the actual revenues are less than estimated revenues, such revenue-sharing payments will be correspondingly reduced automatically.

3. The constitution contemplates that the state may balance its budget by levying new state taxes. By the withholding from local governments of revenue allocated for revenue sharing, the burden of reducing spending or levying new taxes was shifted to the local governments in contravention of the state's obligation either to reduce state spending or to raise new revenue by increasing state taxes.

### OPINION OF THE COURT

1. TAXATION — REVENUE SHARING — REDUCTION OF REVENUES.

Distribution of income and intangibles tax revenues to local units of government under the State Revenue Sharing Act is subject to reduction or delay by the Governor acting with the approval of the House and Senate appropriations committees whenever it appears that the actual revenues for a fiscal period will fall below the revenue estimates on which the appropriations for the period were based (Const 1963, art 5, § 20; MCL 141.901 *et seq.*, 205.131 *et seq.*, 206.1 *et seq.*; MSA 5.3194[401] *et seq.*, 7.556[1] *et seq.*, 7.557[101] *et seq.*).

2. TAXATION — REVENUE SHARING — REDUCTION OF REVENUES.

The authorization in the State Revenue Sharing Act for distribution of income and intangibles tax revenues to local units of

government is not a continuing appropriation but operates as an intention by the Legislature to appropriate funds, subject to budget changes from year to year on the basis of revenues derived from and expenditures required by the people; the funds are not constitutionally dedicated, and the distribution scheme provided by the act does not fall outside the normal appropriation process (Const 1963, art 5, § 20; MCL 141.901 *et seq.*, 205.131 *et seq.*, 206.1 *et seq.*; MSA 5.3194[401] *et seq.*, 7.556[1] *et seq.*, 7.557[101] *et seq.*).

3. TAXATION — REVENUE SHARING — REDUCTION OF REVENUES.

Revenue-sharing payments to local units of government are expenditures authorized by appropriations, and are subject to reduction by the Governor where necessary because of a decline in estimated revenue, notwithstanding the balancing in actual payments which the decline will occasion, because the constitution does not require that the reductions be proportionate to the decline (Const 1963, art 5, § 20; MCL 141.901 *et seq.*, 205.131 *et seq.*, 206.1 *et seq.*; MSA 5.3194[401] *et seq.*, 7.556[1] *et seq.*, 7.557[101] *et seq.*).

DISSENTING OPINION BY LEVIN, J.

4. TAXATION — REVENUE SHARING — REDUCTION OF REVENUES.

*The Governor may not withhold the share of income tax revenues allocated by the Legislature to local governments; revenue-sharing payments that are a predetermined percentage of actual revenues are not based on estimated revenues and therefore are not appropriations within the meaning of the expenditure-reduction provision of the state constitution (Const 1963, art 5, § 20; MCL 141.901 et seq., 205.131 et seq., 206.1 et seq.; MSA 5.3194[401] et seq., 7.556[1] et seq., 7.557[101] et seq.).*

5. TAXATION — REVENUE SHARING — REDUCTION OF REVENUES — ESTIMATED REVENUES.

*Revenue-sharing payments that are a predetermined percentage of actual revenues were not intended to be part of the annual appropriations process, but were allocated in a comprehensive self-balancing and self-executing scheme and, because reduction by the Governor of expenditures authorized by appropriation is permitted only where the appropriation is based on estimated state revenues and where it appears that the estimate will not be realized, such revenue sharing may not be reduced or withheld by the Governor (Const 1963, art 5, § 20; MCL 141.901 et seq.; MSA 5.3194[401] et seq.).*

6. TAXATION — APPROPRIATIONS — REDUCTION OF REVENUES — ESTI-
MATED REVENUES.
 *The Governor may reduce expenditures authorized by appropria-
tion based on estimated state revenues where it appears that
actual revenues will not meet the estimate, but the Governor
may not revise the act which authorized the appropriation nor
cancel the appropriation (Const 1963, art 5, § 20).*

*Bauckham, Reed, Lang, Schaefer & Travis, P.C.*
(by *John H. Bauckham* and *Craig A. Rolfe),* and
*George H. Cross,* Wayne County Corporation Coun-
sel, for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, and *Milton I. Firestone*
and *Regina Ann King,* Assistants Attorney Gen-
eral, for the defendants.

BOYLE, J. The question presented is whether
Const 1963, art 5, § 20 authorizes executive order
delay and reduction of revenue-sharing payments
to local units of government.[1]

## I. FACTS

The State Revenue Sharing Act, 1971 PA 140;
MCL 141.901 *et seq.;* MSA 5.3194(401) *et seq.,*
provides for the distribution of certain state reve-
nues to local units of government. These revenues
include the sales tax, 1933 PA 167, MCL 205.51 *et
seq.;* MSA 7.521 *et seq.,* the intangibles tax, 1939
PA 301, MCL 205.131 *et seq.;* MSA 7.556(1) *et seq.,*
and the income tax, 1967 PA 281, MCL 206.1 *et
seq.;* MSA 7.557(101) *et seq.* The act provides for
quarterly distribution of the local share of sales
and income tax revenues during the months of
August, November, February, and May based on
collections from these taxes for the quarterly peri-

---

[1] Because of the result reached herein, we find it unnecessary to
address the other issues raised by the defendants-appellees.

ods ending the prior June 30, September 30, December 31, and March 31. The formulas used to calculate the local shares are set forth in MCL 205.75; MSA 7.546 and MCL 206.481; MSA 7.557(1481).

The State Revenue Sharing Act further provides for an annual distribution, during each June, of a portion of the intangibles tax collections from the preceding period of July 1 to May 31.

During July of 1981, it became apparent to the State Treasurer that there would be a cash-flow problem in the state's general fund during August and September, 1981. In response to this problem, Governor Milliken authorized the State Treasurer to delay, *inter alia,* the sales and income tax distributions until September 30, 1981.

Further, during September, 1981, it became apparent to Governor Milliken that actual revenues for the fiscal year 1980-1981 would fall below the revenue estimates upon which the appropriations for that period were based. Relying on Const 1963, art 5, § 20, by Executive Order No. 1981-8 issued on September 30, 1981, the Governor reduced, *inter alia,* the income tax revenues distributed by the State Revenue Sharing Act in the amount of $27 million[2] for the quarterly period ending June 30, 1981. Payments under the act, as reduced by this executive order, were made on September 30, 1981.[3]

It also became apparent that actual revenues for the 1981-1982 fiscal year would fall below projected estimates, thereby requiring further reduc-

---

[2] Because they are not decisive concerning the substantive issue herein, dollar amounts throughout are approximate.

[3] The municipalities' statutory share of income tax revenues would have been $51 million. The amount actually distributed was $24 million. The distributed amount based on sales tax revenues was not reduced.

tions. On October 22, 1981, the Governor issued Executive Order No. 1981-9 which reduced, *inter alia,* the amount of income and intangibles tax revenues available to be distributed under the State Revenue Sharing Act.[4]

The plaintiffs filed a complaint for mandamus and declaratory relief in the Court of Appeals on November 3, 1981. They alleged that the Governor had no authority to delay and reduce the municipalities' portion of tax revenues. The Court of Appeals denied mandamus relief by order issued on January 13, 1982. This Court granted leave to appeal on August 10, 1982. 414 Mich 868.

## II

As outlined in the above-stated facts, the present controversy centers on the interpretation of Const 1963, art 5, § 20 and specifically whether funds distributed under the State Revenue Sharing Act are subject thereto.

Const 1963, art 5, § 20 provides as follows:

"No appropriation shall be a mandate to spend. The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes."

The basis of plaintiffs' argument is that the

---

[4] The expected February, May, and August, 1982, payments of income tax revenues were reduced by a total of $5 million. The share of intangibles tax collections was reduced by $7 million.

State Revenue Sharing Act, coupled with 1939 PA 301 and 1967 PA 281, establishes comprehensive self-executing and self-balancing systems for the collection of specific taxes and the appropriation of a portion of those funds to local units of government. Plaintiffs contend that this statutory distribution scheme is outside the normal appropriation process, and, therefore, not subject to Const 1963, art 5, § 20.[5]

Plaintiffs agree that their situation does not come within the specific exclusions listed in the last sentence of § 20:

"The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes."

Rather, plaintiffs contend that revenue-sharing funds are not "expenditures authorized by appropriations".

Plaintiffs' position is that their portions of the income and intangibles tax collections are standing, self-executing appropriations which require automatic distribution to the entitled municipalities without going through the annual appropriation process. Plaintiffs point to the following language of the Income Tax Act to support this premise:

"*An appropriation for each distribution is hereby made* from like taxes collected during the quarter in which the distribution is required to be made." (Emphasis added.) MCL 206.481; MSA 7.557(1481).

With respect to the distribution of intangibles tax

_____
[5] The parties agree that the municipalities' portion of sales tax revenues is mandated by Const 1963, art 9, §§ 8 and 10, and, thus, not subject to reduction by executive order.

collections, plaintiffs cite the following portion of the State Revenue Sharing Act:

"The department of management and budget shall cause to be paid on a per capita basis during each June, $9,500,000.00 of the intangibles tax collections from the preceding period of July 1 to May 31 to each city, village, or township levying at least 1 mill local property tax in the preceding calendar year." MCL 141.912(2); MSA 5.3194(412)(2).

In *Oakland Schools Bd of Ed v Superintendent of Public Instruction*, 392 Mich 613, 620-621; 221 NW2d 345 (1974), we rejected a similar argument for statutory appropriations which would continue from year to year without annual appropriations. There, we held:

"Although the Michigan Legislature may at times place authorization provisions and appropriation provisions in the same bill, we believe that any provision that does not take initial effect during the ensuing fiscal year is intended to function only as an authorization— an intention to appropriate. The dynamics of the budget change from year to year on the basis of the revenues derived and the expenditures required by the people of Michigan. Responsible fiscal policy consequently also requires a yearly reassessment of revenues, spending goals and priorities.

"The Michigan Constitution of 1963 brought to this state new measures designed to require an annual review of the budget and to provide for annual fiscal accountability in both the legislative and executive branches. See, Const 1963, art 4, § 31 and art 5, § 18 and the 'Convention Comment' accompanying each section. To construe 1970 PA 100, § 16a(5) as urged by appellee would violate the spirit if not the letter of these constitutional provisions. The Legislature would be, in effect, appropriating in advance of its ability to accurately forecast available revenues and would thereby be unable to match revenue with appropria-

tions as required by Const 1963, art 4, § 31. In addition, such prospective appropriations would force the Governor to approve or veto the expenditure far in advance of his ability to assess the fiscal needs of the state. See generally, Const 1963, art 5, §§ 18 and 19. We do not believe that the Legislature intended either of these results."

Similarly, in *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 465, 501-502; 242 NW2d 3 (1976), we considered a statute which purported to make a continuing appropriation to the state campaign fund and concluded:

"In *Oakland,* dealing with a statute which purported to be an appropriation bill, but which did not take effect during the ensuing fiscal year,[39] we held that 'any provision that does not take initial effect during the ensuing fiscal year is intended to function only as an authorization—an intention to appropriate'.

"The Court felt that such construction avoided conflict with art 4, § 31, for if such a provision were to be effective as an appropriation, the Legislature would be unable to match revenues with appropriations as is required under the Constitution.

"Section 101(4) presents a very similar situation. That section reads as follows:

" '(4) An amount equal to the amounts designated under subsection (2) each year is appropriated from the general fund of the state to the state campaign fund. The amounts appropriated under this section shall not revert to the general fund but shall remain available to the state campaign fund for distribution without fiscal year limitation except that any amounts remaining in the state campaign fund on December 31 immediately following a gubernatorial general election shall revert to the general fund.'

"This provision is a continuing appropriation, *i.e.,* an appropriation that does take effect in the ensuing fiscal year, but which by its terms continues to appropriate beyond that fiscal period.[40]

"After the ensuing fiscal year, in which revenues can be matched with the appropriation, the conflict with art 4, § 31 created by such a statute is identical with that created by the type of provision found in *Oakland;* in both situations, the budgetary procedure required by the constitutional provision becomes impossible.

"Therefore, under the rationale of *Oakland,* there can be an appropriation to the state campaign fund, only for the ensuing fiscal year but not thereafter, appropriations necessarily being made on a year-to-year basis.

---

"[39] Under Michigan law, the 'ensuing fiscal year' is the fiscal year commencing July 1 and closing June 30. *See Oakland,* 392 Mich 618, fn 4.

"[40] *See Oakland,* 392 Mich 620, fn 5."

---

In both of the above-quoted cases, we relied in part upon Const 1963, art 4, § 31, which states:

"The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year's operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill. One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed."

The budgetary procedure required by this provision, in which estimated revenues can be matched with appropriations, is impossible unless appropriations are made on an annual basis.

Plaintiffs rely on *County Road Ass'n of Michigan v Board of State Canvassers,* 407 Mich 101, 119; 282 NW2d 774 (1979), where we held that the

constitutional and statutory provisions concerning
fuel taxes and license-plate fees are "self-executing
and make transportation tax legislation unique".

Unlike the *Oakland* and *Advisory Opinion* cases,
which involved expenditures from the general
fund, *County Road Ass'n* involved specially ear-
marked funds. Plaintiffs contend that the local
shares of tax revenues are also restricted-purpose
monies with a self-executing distribution scheme.

Plaintiffs' analogy to *County Road Ass'n* is erro-
neous. We dealt there with a constitutionally dedi-
cated fund, Const 1963, art 9, § 9. The only consti-
tutional provision that directly relates to the ap-
propriation for revenue sharing is contained in
Const 1963, art 9, § 10, which mandates distribu-
tion of a certain percentage of the sales tax collec-
tions to local units of government. This constitu-
tional provision is not at issue and has not been
abridged. The special purpose funds to which we
referred in *County Road Ass'n* were established
pursuant to constitutional mandate; thus, the ra-
tionale of that case may not be applied to legisla-
tion which was not so enacted.

### III

Plaintiffs further contend that the Departments
of Treasury and of Management and Budget did
not have the authority to delay distribution of
revenue-sharing funds past the distribution dates
set forth in the State Revenue Sharing Act and
that such funds could not be reduced after the
distribution date.

Under ordinary circumstances the distribution
schedule set forth in the State Revenue Sharing
Act must be followed. However, the cash shortage
and potential budget deficits which affected fiscal

years 1980-1981 and 1981-1982 made these unusual circumstances. It became necessary to invoke the authority given in Const 1963, art 5, § 20 to reduce expenditures. As discussed, Executive Orders Nos. 1981-8 and 1981-9 were issued pursuant to this authority. The distribution schedule of the State Revenue Sharing Act must give way to constitutional mandates and efforts to preserve the fiscal integrity of the state. See *White v Dep't of Social Services,* 20 Mich App 481; 174 NW2d 315 (1969), *lv den* 383 Mich 768 (1970).

Plaintiffs rely on *Wayne County v State Treasurer,* 105 Mich App 249; 306 NW2d 468 (1981), *lv den* 412 Mich 915 (1982), to support their proposition that distributions pursuant to the State Revenue Sharing Act are mandatory and nondiscretionary. In *Wayne County,* the county brought an action for mandamus to compel the distribution of revenues collected under the Single Business Tax Act, 1975 PA 228, MCL 208.1 *et seq.;* MSA 7.558(1) *et seq.* State officials had refused to disburse the funds, claiming as a setoff an amount allegedly owed to the state by the county for its share of the mental health costs for its residents. The county claimed that state officials had no discretion to withhold the county's share of revenues because the act provided that the Department of Treasury "shall pay to each county by February 1 of each year" the amount of single business tax revenues as determined by the statutorily prescribed formula. MCL 208.135; MSA 7.558(135). The Court held that on the facts of this case the "statutory language of the Single Business Tax Act is mandatory and nondiscretionary". 105 Mich App 256.

Plaintiffs contend that the statutory "shall pay" language of the Single Business Tax Act is analogous to provisions of the State Revenue Sharing

Act, Sales Tax Act, and Income Tax Act. There-
fore, they allege that the same result is here
required, *i.e.,* the amount and time of the distribu-
tion may not be changed.

*Wayne County* does not support the result plain-
tiffs seek for several reasons. First, a primary
reason for the Court's holding in *Wayne County*
was the fact that the amount owed by the county
to the state had not been reduced to a sum certain.
In fact, the Court stated:

"We do not address the issue of whether the State
Treasurer's duty to distribute these revenues would be
eviscerated had plaintiff conceded it owed the state a
sum certain for mental health care costs. In this situa-
tion it is conceivable that, despite the absence of any
specific statutory authority in the State Treasurer to set
off claims, we might find no clear legal right in plaintiff
to the discharge of the duty." 105 Mich App 256.

Second, unlike the case at bar, *Wayne County*
addressed the operation and distribution of the
Single Business Tax Act during normal fiscal con-
ditions. *Wayne County* did not present a potential
conflict between the provisions of the Single Busi-
ness Tax Act and any other statute, constitutional
provision, or executive order.[6]

## IV

Finally, we are unable to accept the conclusion
that the budget indicates a legislative intent that
revenue sharing is outside the annual appropria-
tions. Const 1963, art 9, § 17 requires that "[n]o
money shall be paid out of the state treasury
except in pursuance of appropriations made by

---

[6] See 1 Official Record, Constitutional Convention 1961, p 1661. The
discussion therein reveals the delegates' intent that "one of the
benefits of [Const 1963, art 5, § 20] is for use during emergencies".

law". The revenue-sharing acts and the exhibits submitted by the parties confirm that the revenue-sharing payments are paid out of the state treasury. Revenue-sharing payments were specifically appropriated for the 1980-1981 fiscal year by 1980 PA 375 (grants and transfers), and for the 1981-1982 fiscal year by 1981 PA 49 (Department of Commerce). Contrary to the minority's contention, it is clear that the revenues from which revenue sharing is paid are estimated in the specific appropriation bill and are included in the state's budget and, therefore, that revenue-sharing payments are appropriated from estimated revenues.[7]

---

[7] 1980 PA 375 provided in part:

"APPROPRIATIONS SUMMARY:

| | |
|---|---|
| GROSS APPROPRIATIONS | $725,474,200 |
| Appropriated from: | |
| Federal revenues | 21,500,000 |
| Special revenue funds: | |
| Horse racing revenues | 10,973,100 |
| Michigan state waterways fund | 562,000 |
| Sales tax | 236,100,000 |
| Personal income tax | 178,100,000 |
| Single business tax | 161,400,000 |
| Game and fish protection fund | 3,926,200 |
| Recreational land acquisition trust fund | 60,000 |
| State general fund/ general purpose | $112,852,900 |

* * *

"GRANT II—REVENUE SHARING

| | |
|---|---|
| State General Revenue Sharing Grants | $575,600,000 |
| GROSS APPROPRIATION | $575,600,000 |
| Appropriated from: | |
| Special revenue funds: | |
| Sales tax | $236,100,000 |
| Counties | 57,800,000 |
| Cities, villages and townships | 120,300,000 |
| Single business tax | 161,400,000 |
| State general fund/ general purpose | $   -0-   " |

Thus, although the estimated revenues from which revenue-sharing payments are appropriated were not set out in the statements of estimated revenues in the general appropriation bill,[8] it is not correct that they were "excluded" from the appropriations acts.[9] Relevant estimated revenues are set forth in every appropriation act and in the particular appropriations acts. See fn 7. While there may be a technical violation[10] of Const 1963,

---

[8] 1981 PA 49 provided in part:

"STATE GENERAL REVENUE SHARING GRANTS

| | |
|---|---:|
| State general revenue sharing grants | $660,825,200 |
| "GROSS APPROPRIATION | $660,825,200 |
| Appropriated from: | |
| Special revenue funds: | |
| Sales tax | 269,100,000 |
| Personal income tax— county treasurers | 75,800,000 |
| Personal income tax—cities, villages, and townships . | 140,700,000 |
| Single business tax | 163,000,000 |
| Intangibles tax | 9,500,000 |
| State general fund/ general purpose | $    2,725,200" |

[8] For the 1980-1981 fiscal year the statement of estimated revenues for fiscal year 1980-1981 and 1981-1982 are found in 1980 PA 376, § 99, and 1981 PA 30, § 79, respectively.

[9] Appellants argue that only general fund-general purpose expenditures may be reduced pursuant to art 5, § 20, reasoning that the constitutional budgetary provisions accompanying this section at convention consideration used the terms "general appropriation bill". Article 4, § 31, however, requires "an itemized statement of estimated revenue by major source *in each operating fund* for the ensuing fiscal period". This language obviously contemplates that there will be more than one operating fund, refuting appellants' contention that by "general appropriation bill", the constitution means only those appropriations related to the general purpose fund. Moreover, art 5, § 20 authorizes reductions in "expenditures authorized by appropriations" without reference to "general appropriation bills" or to any other limiting language.

[10] While we hesitate to characterize a constitutional violation as a "technicality", we note that the delegates to the constitutional convention contemplated that there might be additional appropriations bills that were not considered at the time the general appropriations bills were passed and when the statement of estimated revenue was prepared. Nevertheless, since the general fund-special purpose and special revenue funds make up so large a part of the state's total

art 4, § 31 in the sense that there did not appear
one single listing in the Public Acts of total esti-
mated revenue and expenditures, the sum of the
statements in each appropriation act of the respec-
tive fiscal year serves the constitutional purpose,
*i.e.,* that the Legislature set forth its estimates of
proposed revenues in comparison to the total of all
appropriations in each fiscal year. 1 Official Rec-
ord, Constitutional Convention 1961, p 1652.

Moreover, were we to find a violation of this
constitutional provision, this finding would not
require the conclusion that the Governor is unable
to fulfill his duty under Const 1963, art 5, § 20.
Were we to so conclude, the Legislature could, by
the simple expedient of failing to include the art 4,
§ 31 itemized statement, protect any legislative
appropriation from being subject to the provisions
of art 5, § 20. Thus, the Legislature could prevent
the Governor from fulfilling his constitutional duty
to balance the budget.

Plaintiffs and the minority of this Court contend
that art 4, § 31 and art 5, § 20 must be read
together and that only those expenditures appro-
priated from the estimated revenues found in the
art 4, § 31 statement of estimated revenues can be
reduced pursuant to art 5, § 20. Examination of
the state's budget illustrates the drastic reduction
of the Governor's art 5, § 20 powers which would
result from our approval of this approach. The
statement of estimated revenues for the fiscal
years 1981 and 1982 included only the revenues
for the state's "general fund-general purpose"
budget. The state's total budget, however, has two
other funds: "general fund-special purpose", where
revenue-sharing funds are listed, and special reve-

budget, they should be included in the statement of estimated reve-
nue.

nue funds, *e.g.,* transportation, school aid, etc. For fiscal year 1981, the total revenue estimated by the Governor[11] was $10,452,673,769. General fund-general purpose revenues were estimated to be $4,907,217,619,[12] less than 47% of the total budget. Similar figures exist for fiscal year 1982.[13] To adopt the reasoning of the plaintiffs and the minority would mean that the Governor would have to reduce expenditures from less than half of the revenue sources, doubling the financial burden on the reduced areas. We do not believe the delegates to the constitutional convention intended to restrict the Governor's power in this manner. Indeed, although the minority opinion states that art 5, § 20 was intended to permit the Governor to reduce spending of the departments of state government under his control, the record of the constitutional convention clearly reveals that the provision was intended to give the Governor broad power to reduce expenditures in many areas.

Const 1963, art 5, § 20, as originally proposed read, in relevant part: "The governor shall reduce *expenditures of executive agencies* whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based". (Emphasis added.) 1 Official Record, Constitutional Convention 1961, p 1635. This provision was amended by substituting "expenditures authorized by appropriations" for the emphasized language. The official record of the constitutional convention

---

[11] Budget Message of the Governor for Fiscal Year 1981.

[12] The Legislature estimated general fund-general purpose revenues to be $4,501.7 million, approximately $400 million less. See 1980 PA 376, § 99.

[13] The total budget estimated by the Governor for fiscal year 1982 was $10,911,653,400 while the general fund-general purpose was $4,976,049,500, 45.6% of the total.

shows that this amendment was made to make it clear that all bodies receiving appropriations could be subject to a reduction in expenditures. Furthermore, it was intended that the Governor would have the discretion to reduce expenditures of some agencies to a greater extent than expenditures of others and there was no requirement that the reductions be proportionate. See 1 Official Record, Constitutional Convention 1961, pp 1670-1672.[14]

Appellants also argue that if revenue-sharing payments can be reduced, long-term bonds issued by municipalities pledging revenue-sharing monies as security, pursuant to the Michigan Municipal Distributable Aid Bond Act, MCL 141.1021 *et seq.;* MSA 5.3197(1) *et seq.,* would be worthless. We note that there is no contention here that any of the appellant municipalities have issued bonds certified under this act. Moreover, even in the absence of an executive order reducing expenditures, the amount of money available for distribution to the cities will fluctuate as tax revenues vary. Thirdly, it is clear that the Legislature did contemplate that revenue-sharing funds could be reduced. MCL 141.1027; MSA 5.3197(7) provides, in part:

"This act shall not be construed to:

[14] Delegate Hoxie explained the provision as follows:

"Now there are areas in which there possibly can be reductions made in the course of the year in the event of undue conditions. There are certain other agencies that it is practically impossible to make reductions. We considered many times in the Legislature a program of a straight percentage cut across the board to reduce appropriations. It is not a very judicious manner in which to accomplish that purpose. In other words, there are agencies in which you materially affect an operation that is considered to be of value to the people of the state. One of them, in my belief, is the schools of higher learning. I think it is impossible, after a program is set up, for a school of higher learning during that fiscal year for which the appropriation is made to materially reduce it. Now you may hold up, say, some of the building program or something of that nature, which has been done; but as far as the operations of those institutions, I don't think that you can possibly reduce that in the course of that term." 1 Official Record, Constitutional Convention 1961, p 1671.

"(a) Create or constitute state indebtedness.

"(b) Require the state to continue to impose and collect taxes from which distributable aid is paid or to make payments of distributable aid.

"(c) Limit or prohibit the state from repealing or amending any law enacted for imposition of taxes from which distributable aid is paid or for the payment or apportionment of distributable aid or the manner, time, or the amount of distributable aid."

V

While we recognize the validity of the minority's observation that reduction of revenue sharing not only threatens the fiscal arrangements of municipalities, but also permits the state to avoid, to that extent, reduction of other expenditures, we cannot accept the conclusion that shifting a financial burden to local units of government contravenes the "state's obligation under the constitution either to reduce state spending or itself raise new taxes". This conclusion merges two distinct concepts, one legal, the other political. The state does have an obligation under the constitution to balance the budget. It has no constitutional obligation to refrain from shifting the financial burdens of government to local governmental units.

Undoubtedly, the political consequences of the constitutional command to balance the budget, art 5, § 18, are far-reaching. A governor's action in reducing revenue sharing may have adverse political consequences. Local government officials will also face political risks if they react by either reducing expenditures or increasing revenues. These are the classic political considerations of elected public officials, to be resolved not in this forum but at the ballot box.

Moreover, as acknowledged by the parties, the

Legislature can act to override an art 5, § 20 executive order and provide a supplemental appropriation. Both the Governor's action in reduction of local revenue-sharing payments and a given Legislature's failure to enact supplemental appropriations remain equally subject to public approval or disapproval.[15] Neither the power of the Legislature nor of the people is impaired by our decision.

The minority opinion maintains that our holding is contrary to the concept of balance of powers and that "[b]y allowing the Governor to amend appropriation acts, [the Court] treads on the Legislature's most basic power".

The minority further maintains that the legislative intent to provide a continuing appropriation outside of the annual budgeting and appropriating provision is clear. Both of these contentions are refuted by the observation that both of the general appropriations acts for the relevant fiscal years contain provisions requiring the director of the Department of Management and Budget to review *"all appropriations made by the Legislature"* (except those made for the legislative and judicial branches of government or from constitutionally dedicated funds), and recommend to the Governor a reduction of expenditures authorized by the appropriations for that fiscal year. The section requires the Governor to review the recommendations and to prepare an order containing reductions in expenditures authorized by appropriations so that actual revenues will be sufficient to equal expenditures. 1980 PA 375, § 10 and 1981 PA 18, § 10.[16] These provisions are either contained in the same public act as the revenue-sharing appropria-

---

[15] The power to enact supplemental appropriation bills is presumed in art 4, § 31.

[16] These provisions are now compiled as MCL 21.510; MSA 3.584(10).

tion, or specifically made applicable to that act.[17] By including such a provision within the appropriations bills, the Legislature clearly intended to confer upon the Governor the authority to reduce *all* appropriations, including revenue-sharing payments which were included among the appropriation bills. Moreover, it cannot be said that the Governor encroached upon the Legislature's power when the Legislature not only conferred the power upon the Governor to perform the act of encroachment, but also imposed a duty to do it.

We follow a plain reading of the constitutional language and hold that the Governor can reduce any expenditure authorized by appropriations other than those specifically exempted by art 5, § 20, and we hold that revenue-sharing payments are expenditures authorized by appropriations. They are subject to reduction by the Governor despite their "self-balancing" nature, since there is no requirement that reductions be proportionate to the decline in estimated revenue.

## VI

After oral arguments were heard in this case, the City of Pontiac filed a motion to intervene as plaintiff-appellant. The City of Pontiac maintains that it has also suffered loss of revenue-sharing payments. We find no grounds for intervention of right, GCR 1963, 209.1, and we deny permissive intervention as this motion is untimely, GCR 1963, 209.2.

### VII. CONCLUSION

We find that distribution of tax revenues to local

---

[17] For fiscal year 1981-1982, revenue-sharing appropriations are found in 1981 PA 49, § 1. Section 3 makes the appropriations made and the expenditures authorized under that act subject to 1981 PA 18.

units of government as delineated in 1971 PA 140, 1939 PA 301, and 1967 PA 281, is subject to Const 1963, art 5, § 20. The order of the Court of Appeals denying mandamus relief is affirmed.

No costs, a public question being involved.

WILLIAMS, C.J., and RYAN, BRICKLEY, and CAVANAGH, JJ., concurred with BOYLE, J.

LEVIN, J. This appeal presents the question whether pursuant to Const 1963, art 5, § 20, the Governor, with the authorization of the appropriation committees of both houses, but without authorization from the Legislature, may withhold from local units of government revenue allocated to them in taxing acts. We would hold that he may not. First, although § 20 authorizes the Governor to "reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based", the revenue-sharing payments to local government were not appropriations within the meaning of that provision because they were not included in the state's budgeting process and were not *based* on estimated revenues itemized pursuant to Const 1963, art 4, § 31. Second, even if revenue-sharing payments are deemed to be appropriations within the meaning of Const 1963, art 5, § 20, that section only empowers the Governor to reduce and defer expenditures; it does not empower him to "revise" acts of the Legislature or to cancel appropriations. The powers to tax and to appropriate are vested in the Legislature. In the exercise of those powers, the Legislature allocated to local units of government a share of new state revenues provided by the income and intangibles

tax acts; only the Legislature can revise the revenue-sharing formulae of those acts.

The text of Const 1963, art 4, § 31 is set forth in part IIA and of Const 1963, art 5, § 20 in part IIB.

## I

The Legislature has enacted a number of statutes providing for the allocation and distribution of a portion of state tax revenues to local units of government. The intangibles, income, and single business tax acts, as originally enacted, appropriated a percentage of the revenue from those taxes to cities, villages, townships, and counties. The State Revenue Sharing Act[1] provides for quarterly distribution to local units of government of their percentages of the income and single business tax collections. The Revenue Sharing Act also provides, in lieu of the percentage formula set forth in the original intangibles tax act, for annual distribution to cities, villages, and townships levying at least 1 mill of local property tax in the preceding calendar year of $9.5 million of the revenue collected under the Intangibles Tax Act.[2]

In September and October of 1981, the Governor issued two executive orders[3] that transferred $39 million of the income tax and intangibles tax collections designated for local governments to the state's general fund.[4] The executive orders were in terms "revisions of" the Revenue Sharing Act; they purported to be authorized by Const 1963, art 5, § 20.

---

[1] 1971 PA 140, MCL 141.901 et seq.; MSA 5.3194(401) et seq.

[2] 1939 PA 301, MCL 205.131 et seq.; MSA 7.556(1) et seq.

[3] Executive Orders Nos. 1981-8, 1981-9.

[4] Local units of government are constitutionally entitled to a percentage of the revenues from the sales tax by virtue of Const 1963, art 9, §§ 8, 10, and that is not subject to the Governor's power under § 20.

Plaintiffs-appellants filed a complaint for mandamus and declaratory relief in the Court of Appeals on November 3, 1981, alleging that the Governor had no authority to reduce, transfer, and divert to state use the portions of the state income and intangibles tax collections earmarked by statute for local units of government. The Court of Appeals refused to issue an order to show cause and denied for "lack of merit on the ground presented". This Court granted leave to appeal. The majority holds that the complaint should be dismissed.

We would hold that the constitution does not empower the Governor to revise an act of the Legislature or to withhold revenue sharing allocated to local governments as part of the political compromise embodied in taxing legislation providing new tax revenue. A change in such allocations can be effectuated only by an act of the Legislature.

II

Read together, the income, intangibles, and single business tax acts, and the State Revenue Sharing Act constitute a comprehensive self-balancing, self-executing statutory scheme. That scheme, combined with the Legislature's decision not to include the funds from which the revenue-sharing payments were to be paid as estimated state revenue or to appropriate specific or fixed amounts of general funds for revenue sharing demonstrates that the revenue-sharing payments were not part of the annual appropriation process and were not appropriations based on revenue estimates within the scope of art 5, § 20. The Legislature's actions

were consistent with the language and spirit of both art 5, § 20 and art 4, § 31.

## A

Unlike other appropriations, the money required to be paid to local governments from the income and single business taxes was a predetermined percentage of the income and single business taxes. The appropriations could stand independently of the annual appropriation process because there was no need to match appropriations with revenues; the size of the appropriations was automatically determined by the amount of revenue.[5]

The self-balancing nature of the revenue-sharing appropriations meant that the authorized appropriations never exceeded actual revenues in the sense contemplated by § 20. The amount appropriated was always the applicable percentage of the actual revenues. The appropriations in 1980 PA 375 and 1981 PA 49, referred to by the majority, were not appropriations "based" on "revenue estimates", but were appropriations of actual revenue.[6]

---

[5] Appellants were also entitled to receive funds from the intangibles tax. Their share was a fixed sum, not a self-balancing percentage. See text accompanying fn 2.

Because the local governments' share of the intangibles tax, unlike the shares from income and single business taxes, was not self-balancing, it can be argued that the fixed-sum appropriation should be deemed to be based on revenue estimates for the purposes of Const 1963, art 5, § 20, to the extent of the excess of the fixed sum over the product of the (i) percentage that the fixed sum was of the estimated revenue and (ii) the actual revenue. As is demonstrated in part II, however, adoption of such a view would not mean that appellants should not receive their share of the intangibles tax. Section 20 only empowers the Governor to reduce and defer expenditures; it does not empower him to cancel appropriations.

[6] In recent years (see fn 7 of the majority opinion), the Legislature has in an annual appropriation bill appropriated for revenue sharing the amount of the estimated revenue allocated for revenue sharing thereby repeating the appropriations set forth in tax acts providing

Because of the self-balancing nature of the revenue-sharing payments, the Legislature treated the funds allocated for those payments specially when fulfilling its constitutional obligation under § 31 to report estimated revenue:

"One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed." Const 1963, art 4, § 31.

Pursuant to § 31, 1980 PA 376 reported the estimated revenue for the fiscal year 1980-1981, but excluded the estimated portions of the income, intangibles, and single business taxes to be paid to local units of government.[7] Legislative statements

---

for revenue sharing and in the revenue-sharing act. The Legislature did not, however, in 1980 PA 375 appropriate $575,600,000 for revenue sharing (majority opinion, fn 7), but rather whatever was actually produced by applying the percentage formulae set forth in the income and single business tax acts against the actual tax collections. If the amount of the actual revenues exceeded the estimates stated in the annual appropriation act, corresponding amounts of revenue sharing were required to be paid although the aggregate amount of revenue sharing exceeded the nominal appropriation set forth in the annual appropriation act. If estimated revenues were less, the lesser amount was the amount actually appropriated. As the majority opinion states (ante, p 681), such a nominal appropriation is, in a sense, an appropriation "from estimated revenues". But the amount appropriated is not based on estimated revenues. The true amount appropriated is the percentage of the actual revenue and, hence, is not based on estimated revenue within the meaning of § 20.

[7] Section 99 of 1980 PA 376 stated as follows:

"In accordance with section 31 of article 4 of the state constitution of 1963, the following itemized statement of estimated revenue, the total of which is not less than the total of all appropriations made from these funds in the general appropriations bills as passed, for the ensuing fiscal period is hereby reported:

State of Michigan
General Fund—General Purpose
Statement of Estimated Revenue
(in millions)

| Source of Revenue | General Purpose |
|---|---|
| Personal Income Tax Withholding | $ 2,595.0 |

of estimated state revenue pursuant to § 31 in
other years similarly excluded the local govern-
ments' share of tax revenue from the estimate of
state revenue.[8]

The Legislature's determination that revenue-

| | | |
|---|---|---|
| Annual and Quarterly Payments | | 287.0 |
| Less: Refunds | | (762.0) |
| Local Share and Campaign Fin. | | (180.0) |
| Net Personal Income | $ | 1,940.0 |
| | | |
| Consumption Taxes | | |
| Sales | $ | 386.0 |
| Use | | 258.0 |
| Cigarette | | 115.4 |
| Beer and Wine | | 52.0 |
| Liquor | | 19.3 |
| Subtotal | $ | 830.7 |
| | | |
| Other Taxes | | |
| Single Business | $ | 775.0 |
| Insurance Company Premium | | 130.0 |
| Telephone and Telegraph | | 101.0 |
| Inheritance | | 57.0 |
| Intangibles | | 44.0 |
| Horse Racing | | 15.0 |
| Oil and Gas Severance | | 88.5 |
| Railroad | | 1.5 |
| All Other Taxes | | 8.0 |
| Subtotal | $ | 1,220.0 |
| | | |
| TOTAL TAXES | $ | 3,990.7 |
| | | |
| Non-Tax Revenue | | |
| Federal Revenue Sharing | $ | -0- |
| Other Federal Aid | | 40.4 |
| From Local Agencies | | 15.8 |
| From Mental Patients/Wards | | 23.5 |
| From Licenses and Permits | | 56.3 |
| From Investment of Surplus | | 17.5 |
| Oil and Gas Royalties | | 23.0 |
| Lottery | | 232.0" |

The tax revenue figures stated above are net figures that do not
include the local governments' portion, as is confirmed by comparing
them with the gross figures stated in the Governor's budget message
to the Legislature.

[8] See, e.g., 1981 PA 30.

sharing payments to local governments were outside of the annual appropriation process is also reflected in the Legislature's failure to appropriate specific or fixed amounts of state revenue to local governments.[9] The first appropriation bills after the Income Tax Act was enacted in 1967, MCL 206.1 *et seq.;* MSA 7.557(101) *et seq.,* did not appropriate revenue-sharing payments. Because the Income Tax Act appropriated the local governments' share of the income tax directly from the revenues and the Revenue Sharing Act appropriated the local governments' portion of the intangibles tax directly from the revenues, there was no need for the Legislature to repeat that authorization in an annual appropriations bill.

The self-balancing nature of the revenue-sharing payments and the Legislature's special treatment of those payments demonstrate that the payments were not appropriations based on revenue estimates. The amount appropriated depended on actual revenue. Appellants' share of the income and single business taxes was a self-balancing, standing appropriation that required automatic distribution to the entitled municipalities. It was not reflected in the annual budgetary and appropriation process.[10]

## B

Because revenue-sharing payments were not part of the budgeting process and were not based on state revenue estimates, they were not appropriations for the purposes of § 20. Section 20 only

[9] 1980 PA 375.

[10] An appropriation might be reflected, wholly or partly, in the annual budgetary process, but not be based on revenue estimates. This might occur where the Governor recommends a change in a self-balancing revenue-sharing appropriation.

authorizes the reduction of expenditures autho-
rized by appropriations "based" on state revenue
estimates:

"No appropriation shall be a mandate to spend. The
governor, with the approval of the appropriating com-
mittees of the house and senate, shall reduce *expendi-
tures authorized by appropriations whenever it appears
that actual revenues for a fiscal period will fall below
the revenue estimates on which appropriations for that
period were based.* Reductions in expenditures shall be
made in accordance with procedures prescribed by law.
The governor may not reduce expenditures of the legis-
lative and judicial branches or from funds constitution-
ally dedicated for specific purposes." (Emphasis added.)
Const 1963, art 5, § 20.

Not based on revenue estimates, the revenue-shar-
ing payments were outside of the scope of that
constitutional provision. The language of § 20 thus
did not authorize the actions that the Governor
took with the approval only of the appropriation
committees and not of the Legislature.

To be sure, the revenue-sharing payments were
made pursuant to appropriations within the mean-
ing of Const 1963, art 9, § 17, which requires that
"[n]o money shall be paid out of the state treasury
except in pursuance of appropriations made by
law". Section 20, in contrast with § 17, however,
only covers appropriations based on revenue esti-
mates. The revenue-sharing payments were not
made pursuant to appropriations based on revenue
estimates. Federal revenue-sharing payments are
also made pursuant to appropriations paid out of
the state treasury, but that does not authorize the
Governor to cancel those payments.

The statement at the conclusion of the majority
opinion that the Governor can reduce any expendi-
ture authorized by appropriations whether or not

the appropriation is based on estimates of revenue reads out of the constitution the words "on which appropriations" "were based". Those words are rendered superfluous by the majority's construction, which demonstrates once again that the so-called plain reading or plain meaning rule is inadequate for the task of constitutional interpretation. What is required is a construction of the constitution that carries out the constitution's purpose, a construction that addresses the evil of an unbalanced budget but confines and protects against abuse of the power conferred.

C

The Legislature's determination that the revenue-sharing payments were not part of the annual budgeting and appropriation process was consistent with the spirit of § 20 and with the circumstances leading to its addition to the constitution. The framers of § 20 were concerned with balancing the state's budget and ensuring "sound business administration".[11] Because the revenue-sharing payments were self-balancing and were payable from new state revenue that might not otherwise have been enacted, those legislative determinations were consistent with that objective.[12]

Far from hindering the constitutional objective of balancing the budget, allowing the Legislature to allocate some funds outside of the annual appropriation process in order to raise more general revenue makes balancing the budget more feasible. There comes a point where the public has been saturated with state revenue-raising exactions and will let its representatives burden it no more.

---

[11] 1 Official Record, Constitutional Convention 1961, p 1658 (statement of Mr. Shackleton); see generally, *id.*, pp 1634-1680.

[12] See fn 5 and accompanying text.

Allocations in new taxing legislation and the Revenue Sharing Act to local units of government of revenue sharing reflect political compromises designed to accommodate the revenue needs of local units of government. In exchange for a legislative commitment of additional direct funding, senators and representatives concerned with the needs of local units of government were willing to support the enactment of taxing acts that raised additional revenue for the state. The majority's construction of the constitution, by subjecting such self-balancing allocations to the Governor's power under § 20, impedes the state's power to increase revenue and impedes the constitutional objective of balancing the budget.

The majority expresses concern that "the Legislature could, by the simple expedient of failing to include the art 4, § 31 itemized statement, protect any legislative appropriation from being subject to the provisions of art 5, § 20. Thus, the Legislature could prevent the Governor from fulfilling his constitutional duty to balance the budget."[13] We agree that neither the Legislature's failure to include in a general appropriations bill the constitutionally required statement of appropriations that are based on estimated revenue, nor the omission therefrom of an appropriation in fact based on estimated revenues, could inhibit the Governor's exercise of the power conferred in § 20 with respect to such an appropriation. Creating a self-balancing fund, however, does not interfere with the Governor's discharge of his constitutional duty to balance the budget. It facilitates balancing the budget. The Legislature, the branch that has the exclusive authority to appropriate money, acted within its authority.

---

[13] *Ante,* p 683.

D

The Legislature's determination that revenue-sharing payments were independent of the annual appropriations process was also consistent with the language and spirit of § 31.[14] Nothing in the language of that provision prohibits the Legislature from allocating a percentage of tax revenues to local units of government independently of the annual appropriations process.[15]

The majority opinion indicates that "there may be a technical violation of Const 1963, art 4, § 31".[16] In support of that proposition, it states that the budgetary procedure required by § 31 "in which estimated revenues can be matched with appropriations, is impossible unless appropriations are made on an annual basis".[17] Both of the opinions on which the majority primarily relies, *Oakland Schools Bd of Ed v Superintendent of Public Instruction*, 392 Mich 613; 221 NW2d 345 (1974), and *Advisory Opinion on Constitutionality of 1975*

[14] The complete text of Const 1963, art 4, § 31 provides as follows:

"The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year's operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill. One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed."

[15] We are not today faced with, nor do we address, the question of whether the Legislature could bypass the annual appropriation process entirely by making all appropriations a percentage of tax revenues. In this connection we note that the revenue-sharing allocations in the instant case were only payable out of new tax revenue. See part IC.

[16] *Ante*, pp 682, 683.

[17] *Ante*, p 677.

*PA 227,* 396 Mich 465; 242 NW2d 3 (1976), make
that point. The concern that those opinions ex-
press about the Legislature appropriating funds in
advance of its ability accurately to forecast avail-
able revenues, however, is not pertinent when the
appropriation is self-balancing. There was no need
to match appropriations with revenues because the
size of the appropriation would be automatically
determined by the amount of the revenue. We
would construe the Legislature's actions as consti-
tutional.

### E

The framers of § 20 intended that the Governor,
when faced with an apparent deficit resulting from
a reduction of state revenue from the amount
estimated and on which appropriations were
based, would reduce the *spending* of state govern-
ment.[18] Through the passage of the Uniform Budg-

---

[18] See 1 Official Record, Constitutional Convention 1961, p 1661
(statement of Mr. Bentley):
"All we are asking in section d of the committee proposal, Mr.
Chairman, is that during the course of the fiscal year for which an
appropriation or appropriations have been made, that the governor,
as he should be doing in any event, should be making a careful
survey of revenues. If it should appear, during the course of that
fiscal year, that revenues will fall below prior estimates, and that, of
course, can be readily foreseen when tax collections come in, [he
should] then endeavor *to reduce his spending program* accordingly. In
other words, that if he has notice that revenues are not up to his
original estimates, that he will then not go ahead and conform to his
original estimates of spending; *if he knows or has reason to believe
the revenues will fall below the estimates which he originally set
forth, that he thereby endeavor to reduce his spending accordingly."*
(Emphasis added.)

That art 5, § 20 was intended to relate to spending is made clear in
the first sentence of that provision: "No appropriation shall be a
mandate *to spend".* (Emphasis added.)
    Elimination of the words "expenditures of executive agencies" and
the substitution of "expenditures authorized by appropriations" *(ante,*
p 684) makes clear that all appropriations based on estimated reve-
nues are subject to reduction, but does not subject appropriations not
based on estimated revenue to the Governor's power under § 20.

eting and Accounting Act, MCL 141.421 *et seq.;* MSA 5.3228(21) *et seq.,* the Legislature imposed a similar responsibility for balanced budgets on local units of government. Local communities took their revenue-sharing funds into account when planning their budgets. Those budgets determined the amount of revenue that those governments raised on a local level. When the Governor and the appropriations committees decided to cancel some revenue-sharing payments to local units of government in lieu of a reduction of state spending, they created a domino effect that threatened the fiscal arrangements of municipalities throughout the state. At a time when they might no longer be able to raise additional funds at the local level, local governments were obliged to reduce services or borrow to pay for expenditures that could not be deferred. By imposing the externality of the state's budgetary deficit on local governments, the Governor and appropriations committees contravened the language and spirit of § 20 and undermined a statutory scheme designed in light of that constitutional provision.

The constitution requires a reduction of state spending to the extent that revenue estimates will not be realized. Reducing revenue sharing to local units of government permits the state to avoid, to that extent, a reduction of state spending. This is accomplished by finding a revenue source—state tax revenue earmarked and allocated to local units of government—that was not included in the revenue estimates on the basis of which appropriations were made.[19]

---

[19] The majority states that adoption of the position advocated in this opinion "would mean that the Governor would have to reduce expenditures from less than half of the revenue sources, doubling the financial burden on the reduced areas" *(ante,* p 684). The predicate of that argument is that only half of the total revenues is subject to the Governor's power under § 20. That will continue to be true despite

The constitution contemplates that the state may balance the budget by levying new state taxes. It does not contemplate that this will be done by local units of government raising new taxes, but the action taken by the Governor and the appropriations committees could have the effect of requiring local units of government to raise taxes to fund local services or to repay funds borrowed to do so. By avoiding a reduction of state spending and expenditures, the Governor and the appropriations committees shifted to local units of government the burden of levying new taxes, in contravention of the state's obligation under the constitution either to reduce state spending or to itself raise new taxes if it wished to continue the same level of spending.[20]

### III

#### A

Even if revenue-sharing payments are held to be appropriations within the scope of § 20, that sec-

the adoption by the majority of the view set forth in the opinion of the Court. The majority thus criticizes the position advocated in this opinion on the basis of limitations on the Governor's § 20 power that this Court is powerless to eliminate.

The majority states that general funds revenues were estimated to be $4,907,217,619 (ante, p 684). State general revenue-sharing grants (as set forth in 1980 PA 375) were $575,600,000. If the revenue shortfall was, say, 10%, then revenue sharing would be reduced automatically by 10%. It does not appear that it is the local governments that were seeking to impose a financial burden on other areas of state expenditure. Rather, the advocates of other areas of state expenditure sought to burden the local governments, without legislative approval, with a greater percentage of the burden of the shortfall than the local governments' aliquot percentage of the shortfall prescribed in the tax and revenue-sharing acts.

[20] We agree with the majority that the state has no constitutional obligation under § 20 to refrain from shifting the financial burdens of government to local governmental units (ante, p 686). The Governor may not, however, do so without the approval of the Legislature except to the extent of appropriations that are based on estimated revenue.

tion does not empower the Governor to cancel the payments. Section 20 does not empower the Governor to revise acts of the Legislature appropriating money, but only to "reduce expenditures". The constitution empowers the Governor to reduce expenditures when there is insufficient revenue to pay for them; it does not authorize the Governor "to revise" appropriation acts, a task only the Legislature is constitutionally authorized to perform. The constitutional debates emphasized that distinction explicitly: "Remember, we are not giving the governor control over appropriations, only expenditures under emergency conditions".[21]

In practical effect, the distinction means that the Governor is only empowered to spread the expenditure out to conform to revenues.[22] The

---

[21] 1 Official Record, Constitutional Convention 1961, p 1658 (statement of Mr. Shackleton). See also *Id.* ("There is a distinction between appropriations and expenditures. * * * Under the provision of this sentence, *he may then adjust expenditures, not appropriations which have formerly been determined by the legislature.")* (emphasis added); *id.,* p 1660 (statement of Mr. Bentley) *("[N]owhere in the committee report does it talk about cutting appropriations.* It does talk about reducing expenditures which, I submit * * * is a completely different item from an appropriation. An appropriation is something that is submitted by the governor, * * * or in a private bill by one of the members of the legislature. It is passed in the legislature and signed by the governor into law, and then it becomes in effect. Then, once the appropriation becomes a matter of law, the question of the rate of expenditure is entirely in the hands of the executive branch of the government and the chief executive.") (Emphasis added.)

[22] This intention is amply documented in the convention debates:

"I respectfully submit, Mr. Chairman, that it is not a question, necessarily, of eliminating this expenditure or that program; it is a matter which has been practiced before and can be practiced again very easily, of the so called 'stretch out'. In other words, for example, if a building program is involved, it is very possible to spread that building program from one fiscal year into the next fiscal year and thereby endeavor to make the expenditures conform more closely to the revenues. That is all we are suggesting. That is all we are trying to require the chief executive to do. That is all we are proposing here in section d of the committee proposal; that when the chief executive knows or has reason to believe that his original estimates of tax revenues were overestimated, and he sees, during the course of the fiscal year, that revenues are not coming in at the rate that he

Governor exceeded his authority in purporting to "revise" an act of the Legislature. The amounts appropriated that have not been expended remain appropriated.

## B

The extent to which the Governor exceeded his authority is manifested in the form of the two executive orders. They both purported to be "revisions of" the revenue-sharing act. Nothing in the 1963 Constitution gives the Governor the authority to amend an act of the Legislature. Such a concept is alien to traditional views of the balance of powers.

The Legislature traditionally has been vested with the power to tax and to appropriate. By allowing the Governor to amend appropriation acts, the majority today treads on the Legislature's most basic power.

The majority emphasizes that the Legislature can override an executive order and enact a supplemental appropriation. If the Legislature has constitutionally allocated a percentage of state revenue to local units of government that is not subject to the Governor's § 20 power, however, it is no answer to say that the Governor's misuse of power can be overridden by the super-majority of the Legislature necessary to override a veto or that the voters have recourse at the polls at the next election.

## C

The majority opinion states that this Court's

---

originally believed them to be and presented those beliefs to the legislature, that he then reduce the expenditures or stretch his expenditures out to conform to the reduced tax revenues." 1 Official Record, Constitutional Convention 1961, p 1661 (statement of Mr. Bentley).

opinion in *Oakland Schools Bd of Ed v Superintendent of Public Instruction,* 392 Mich 613, 619-621; 221 NW2d 349 (1974), indicates that standing appropriations are inconsistent with the spirit of the constitution.[23] *Oakland,* however, presented a narrow question of *statutory interpretation* and *legislative intent:*

"At the heart of this controversy lies *legislative intent.* If we were able to make findings of fact concerning the *legislative intent* behind 1970 PA 100, § 16a(5), our task today would be a simple one indeed.

\* \* \*

"In sum, we believe that the most reasonable construction that can be made of the *legislative intent* behind the enactment of 1970 PA 100, § 16a(5) is to find that this section expressed only a *desire* to appropriate in the future. This *construction* avoids any conflict with the constitutional requirements binding upon both the Legislature and the Governor, and, in our opinion, further the comity between these two branches that is necessary for the responsible functioning of the state government."[24]

The Court refused to address the validity of standing appropriations:

"We do not address herein the validity of what appellee describes as a continuing appropriation—an appropriation that takes effect in the ensuing fiscal year and by its terms continues to appropriate beyond that fiscal period."[25]

---

[23] *Ante,* pp 675-677.

[24] 392 Mich 619-621 (emphasis of *"desire"* in original; other emphasis supplied).

[25] 392 Mich 620, fn 5.

In the present case, legislative intent to provide a continuing appropriation outside of the annual budgeting and appropriating provision is clear.[26] Its decision to exclude revenue sharing from estimated revenue and to appropriate only a *pro forma* self-balancing plug figure[27] that did not tap estimated general revenue clearly evidences that intent.

## IV

Although we would hold that the amount of revenue-sharing payments that has been appropriated but not expended remains appropriated, the former Governor's actions estop the present Gover-

---

Although *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 465, 501; 242 NW2d 3 (1976), states that "any provision that does not take initial effect during the ensuing fiscal year is intended to function only as an authorization—an intention to appropriate", that statement is not dispositive for several reasons. First, that general statement was derived from *Oakland Schools,* but it mischaracterized the holding of the *Oakland* case, which merely construed a specific statute on the basis of legislative intent. Second, neither *Oakland* nor *Advisory Opinion on 1975 PA 227* involved self-balancing revenue-sharing appropriations. Third, unlike the instant case, both *Oakland* and *Advisory Opinion* involved the appropriation of money from the state's general fund. Fourth, because advisory opinions of the justices are not decisions rendered after a hearing on the merits, they are only persuasive and are not considered to be precedent within the doctrine of stare decisis. *Cassidy v McGovern,* 415 Mich 483, 495; 330 NW2d 22 (1982).

[26] Although legislative intent will generally coincide with what the Legislature has done, legislative intent is not controlling. Unless the appropriation is in fact self-balancing and thus not based on estimated revenue, it must be included in the annual budgeting and appropriation process.

The majority refers to legislation conferring on the Department of Management and Budget the power to review "all appropriations made by the Legislature" and to make recommendations for reduction in expenditures *(ante,* p 687). Such legislation cannot confer on the Governor power to reduce appropriations by executive order that he does not have under § 20. An appropriation that is not based on estimated revenue may only be reduced by an act of the Legislature.

[27] See fn 6 of this opinion, and fn 7 of the majority opinion.

nor from expending deferred appropriations. The present Governor is obliged to submit a new budget to the Legislature that reflects the unexpended appropriations and balances them with estimated revenue as required by the constitution. The mandate of the constitution that nothing be appropriated beyond estimated revenues must be observed. It is unquestioned that the Legislature has the authority to cancel or alter all appropriations, including revenue-sharing payments.

We would hold that, subject to that legislative authority, the plaintiffs should be paid the $39 million share of the income and intangibles taxes to which the tax and revenue-sharing acts entitled them. In order to ensure that plaintiffs receive the time value of the money to which they were entitled, interest should be paid on all amounts deferred.[28]

KAVANAGH, J., concurred with LEVIN, J.

[28] See *Dayton v Dakin Estate,* 103 Mich 65, 71; 61 NW 349 (1894); *McGuire v Galligan,* 53 Mich 453, 456; 19 NW 142 (1884); *McCreery v Green,* 38 Mich 172, 185 (1878).