MUSSELMAN v GOVERNOR

Docket Nos. 97322, 97915. Argued November 1, 1994 (Calendar No. 7). Decided April 25, 1995. Rehearing granted 449 Mich 1205.

Ann Musselman and other current and retired members of the Public School Employees Retirement System sought mandamus in the Court of Appeals to compel prefunding of health care benefits for the 1991-92 fiscal year. The Court of Appeals, REILLY, P.J., and CORRIGAN, J. (CAVANAGH, J., concurring), denied the petition, ruling that it was without authority to order the relief requested (Docket No. 142142). The plaintiffs again sought mandamus to compel prefunding for the 1992-93 fiscal year, which the Court, REILLY, P.J., and HOOD and CORRIGAN, JJ., denied (Docket No. 166792). The plaintiffs appeal.

In an opinion by Justice BOYLE, joined by Chief Justice BRICKLEY, and Justices CAVANAGH and MALLETT, the Supreme Court *held:*

Although failure to prefund retirement health care benefits for members of the Public School Employees Retirement System violates Const 1963, art 9, § 24, mandamus must be denied because the Supreme Court has no authority to order the Governor or the Legislature to appropriate funds under these circumstances.

Justice RILEY, joined by Justice LEVIN, concurring in part and dissenting in part, stated that because financial benefits do not include health benefits for purposes of Const 1963, art 9, § 24, the funds were not constitutionally dedicated under Const 1963, art 9, § 24 and could be cut by the Governor under Const 1963, art 5, § 20. The plaintiffs should be denied relief.

Justice WEAVER took no part in the decision of this case.

*White, Beekman, Przybylowicz, Schneider & Baird, P.C.* (by *Karen Bush Schneider* and *Suzanne Krumholz Clark*), for the plaintiffs-appellants.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Michael J. Moquin,*

Assistant Attorney General, for the defendants-appellees.

Amicus Curiae:

*Howard & Howard* (by *Donald F. Tucker* and *Wade E. Haddad*) for the Michigan Association of Retired School Personnel.

BOYLE, J. The question presented concerns funding of retirement health care benefits for members of the Public School Employees Retirement System. Although we find that the failure to fund these benefits as they arise violates Const 1963, art 9, § 24, we cannot grant the plaintiffs' request for mandamus.

I

FACTS AND PROCEDURAL HISTORY

The plaintiffs in these consolidated cases are current and retired public school employees who are members of the Michigan Public School Employees Retirement System (MPSERS). That system, established pursuant to MCL 38.1301 *et seq.*; MSA 15.893(111) *et seq.*, covers employees of public local school districts, intermediate school districts, tax-supported community or junior colleges, and various state universities. MCL 38.1305(1); MSA 15.893(115)(1); MCL 38.1306(4); MSA 15.893(116)(4). Retirees receive both a monthly monetary allowance, see MCL 38.1384; MSA 15.893(194), and various health care benefits, see MCL 38.1391; MSA 15.893(201). This case concerns those health care benefits.

Health insurance premiums for retired public school employees were first funded by the state in 1975. Under 1974 PA 244, § 27e, the Retirement

Board paid "hospitalization and medical coverage insurance premium . . . not to exceed $25.00 per month . . . ." That act further specified that premiums would be paid "only during those fiscal years for which an appropriation is made which is sufficient to cover the premium payments likely to be made for that year or on a terminal funding basis." *Id.*

This statute was amended several times over the next few years. Each amendment increased the amount of the premium that the state would pay. In 1983, the act was amended to provide that "[t]he retirement system shall pay the entire monthly premium . . . ." 1983 PA 143.

In 1985, the statutes governing health care benefits for members of MPSERS were amended extensively. See 1985 PA 91. While the state continued to pay the entire monthly premium for retirees' health benefits, that payment was no longer contingent on a yearly appropriation. Instead, the statute required the board to pay the entire monthly premium for any retirant or beneficiary receiving a monthly retirement allowance: "[t]he retirement system shall pay the entire monthly premium or membership or subscription fee for . . . a retirant or retirement allowance beneficiary who elects coverage in a group health benefits plan authorized by the retirement board and the department." 1985 PA 91, § 91(1).

The statute also required the state to fund benefits being earned by[1] current employees: "[t]he contribution rate for other benefits, including health benefits, shall be computed using an individual projected benefit entry age normal cost method of valuation." 1985 PA 91, § 41(2). Pursu-

---

[1] At oral argument, the defendants conceded that these statutes create a right to receive health benefits that may not be impaired.

ant to this statute, the state prefunded retirement health care benefits until fiscal year 1990-91.

On June 18, 1991, however, while the state was in the midst of budgetary problems, the Governor issued Executive Order[2] No. 1991-17. That order reduced the appropriation to the public school employees retirement system by approximately $54 million[3] by amending the controlling statute:[4]

> (1) The appropriations to the public school employees retirement system from the school aid fund, as provided jointly by Act 214 of the Public Acts of 1990 and Act 357 of the Public Acts of 1990, hereby are reduced by $53,795,700 GFGP/ School Aid Fund ($55,773,300 Gross) as a result of the following revision of section 41(2) of Act 300 of the Public Acts of 1980 (public school employees retirement act of 1979) as amended:
>
> SECTION 41(2)
>
> (2) The contribution rate for benefits payable in the event of the death of a member before retirement or the disability of a member shall be com-

---

[2] The Governor's order was issued with the concurrence of the appropriation committees of the House and Senate, as required by Const 1963, art 5, § 20:

> No appropriation shall be a mandate to spend. The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes.

[3] As a result of that cut, the state received less money from the federal government. Consequently, the net underfunding of the retirement system for 1991-92 was greater than the amount cut.

[4] The plaintiffs have not questioned whether the Governor has authority to amend statutes that are not appropriation bills.

puted using a terminal funding method of valuation. The contribution rate for other benefits, including health benefits, shall be computed using an individual projected benefit entry age normal cost method of valuation. FOR THE 1990-91 STATE FISCAL YEAR, THE CONTRIBUTION RATE FOR HEALTH BENEFITS SHALL BE COMPUTED USING A CASH DISBURSEMENT METHOD.

On July 3, 1991, plaintiffs filed a complaint for writ of mandamus with the Court of Appeals, asserting that Executive Order No. 1991-17 violated several provisions of the Michigan Constitution and the United States Constitution. On November 19, 1991, the Court summarily denied the plaintiffs' complaint.

In preparation for fiscal year 1991-92, the Governor made an executive recommendation to cease actuarially prefunding health benefits. Pursuant to this recommendation, the Legislature did not fund benefits being earned by current employees, and appropriated funds only to pay insurance premiums for retirees and beneficiaries. See 1991 PA 119. On April 16, 1992, Governor Engler issued Executive Order No. 1992-6, which amended 1980 PA 300, § 41(2) in a way similar to Executive Order No. 1991-17, except that it applied to the "1991-92 state fiscal year."

On December 10, 1991, plaintiffs filed both a motion for rehearing and a motion to amend their complaint by adding a count challenging 1991 PA 119. On February 4, 1992, the Court of Appeals granted both motions and ordered "a full hearing on the merits in the same manner as an appeal of right."

For the 1992-93 fiscal year, the Legislature appropriated funds only to pay insurance premiums of retirees and beneficiaries, which amounted to just over $229 million. See 1992 PA 148. Again,

the Legislature did not appropriate money for health benefits being earned by current employees, and amended MCL 38.1341(2); MSA 15.893(151)(2), accordingly:

> Except as otherwise provided in this subsection, the contribution rate for other benefits, including health benefits, shall be computed using an individual projected benefit entry age normal cost method of valuation. *For the 1992-93 state fiscal year, the contribution rate for health benefits shall be computed using a cash disbursement method.* [1992 PA 158. Emphasis added.]

On February 23, 1993, however, the appropriation was cut by approximately half, a reduction of $115.6 million, in Executive Order No. 1993-6. Because the entire appropriation had been necessary just to pay insurance premiums for retirees and beneficiaries, reduction had to come from somewhere else. The order specified that "health insurance benefits shall be paid from the Reserve for Health Benefits as provided by section 34 of Act 300 of the Public Acts of 1980."

Plaintiffs then moved to amend their complaint for mandamus to add a count alleging that the state's actions in the 1992-93 budget year also violated the constitution. This motion was denied April 12, 1993.

On July 19, 1993, the Court of Appeals denied plaintiffs' petition for mandamus (hereinafter *Musselman I*). 200 Mich App 656; 505 NW2d 288 (1993). The majority[5] declined to reach the merits, and instead ruled that it was "without authority

---

[5] The third judge concurred in the result, writing that although he thought the Court possessed authority to issue mandamus to enforce constitutional rights, he was convinced that the provision does not require that health care benefits be prefunded because "the framers of the constitution did not have health care premiums in mind when they adopted" it. 200 Mich App 668.

to order the relief requested by the plaintiffs in any event":

> In the present case, it is clear that plaintiffs are not seeking to compel the performance of a ministerial act. Rather, they seek an order compelling the Governor to exercise his discretion under Const 1963, art 5, § 20 in a particular manner. We cannot provide such a remedy. Furthermore, it is not within our province to order the Legislature to appropriate funds. [*Id.* at 662-664.]

In addition, the majority found that the plaintiff had not established that any of the remaining defendants possessed authority to appropriate or transfer money to the Retirement System. *Id.* at 665.

On August 2, 1993, plaintiffs filed an original complaint for mandamus regarding the 1992-93 budget year (hereinafter *Musselman II*). This complaint was summarily denied. We granted the plaintiffs application for leave to appeal in both cases. 445 Mich 881 (1994).

## II

### THE CONSTITUTIONALITY OF FUNDING PENSION HEALTH CARE BENEFITS ON A CASH DISBURSEMENT BASIS

There is no dispute that, since the 1990-91 fiscal year, the state has failed to fund retirement health care benefits being earned[6] by current employees (as opposed to benefits owed to retired members, which have continually been satisfied in full). The plaintiffs allege that this failure violates

---

[6] The word "earned," as used throughout the opinion, refers to "[f]inancial benefits arising on account of service rendered in each fiscal year," in contrast to benefits owed to retired members.

the second sentence of Const 1963, art 9, § 24,[7]
which requires that "[f]inancial benefits arising on
account of service rendered in each fiscal year
shall be funded during that year and such funding
shall not be used for financing unfunded accrued
liabilities." We agree.

### A. RETIREMENT HEALTH CARE BENEFITS
### FALL WITHIN CONST 1963, ART 9, § 24

At the outset we emphasize that the defendants
do not argue that health care benefits are not
"[f]inancial benefits *arising on account of service
rendered* in each fiscal year . . . ." We have nei-
ther a factual record nor legal arguments on the
subsidiary question when health care benefits
"arise," and we intimate no opinion regarding that
question. Instead, the threshold issue before us is
defendants' contention that "health benefits are
not 'accrued financial benefits' within the first
paragraph of art 9, § 24—and are not therefore
subject to the prefunding requirements of the
second paragraph thereof."

Defendants trace the drafting history of art 9,
§ 24,[8] noting that delegate proposals and proceed-

---

[7] In its entirety, the provision reads:

The accrued financial benefits of each pension plan and
retirement system of the state and its political subdivisions
shall be a contractual obligation thereof which shall not be
diminished or impaired thereby.

Financial benefits arising on account of service rendered in
each fiscal year shall be funded during that year and such
funding shall not be used for financing unfunded accrued
liabilities.

[8] The only explicit elaboration on the term "accrued financial
benefits" was this remark by delegate Van Dusen:

[T]he words "accrued financial benefits" were used de-
signedly, so that the contractual right of the employee would be

ings before the Committee on Finance and Taxation applied to "benefits" or "accrued benefits." They argue that the subsequent addition of the word "financial" suggests that the provision governs only direct payments to the retirant, and that therefore, although health care may be a benefit, it is not a "financial benefit."

Whether the restriction to "financial" benefits excludes health care benefits from the scope of the provision depends to some extent on one's point of view. From the perspective of the employee, it is not completely clear that health insurance is a "financial benefit." Although health insurance is not cash that retirants may spend as they wish, employees receive health insurance in lieu of additional compensation, and they would have to purchase insurance if it were not provided to them. This analysis tends to show that retirement health care benefits are financial benefits, but the fact that it does not yield a conclusive answer indicates that this point of view is likely the wrong one.

Instead, the proper perspective from which to interpret the term "financial benefits" seems to be that of the government. The purpose of the provision is, after all, to check legislative bodies, requiring them to fund pension obligations annually, and thereby preventing back door spending. Article 9, § 24 arose out of concern about legislative bodies failing to fund pension obligations at the time they

---

limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. [1 Official Record, Constitutional Convention 1961, pp 773-774.]

Unfortunately, he addresses which rights are contractual, and thus enforceable at law under the first clause of Const 1963, art 9, § 24—a question distinct from what must be prefunded under the second clause.

were earned, so that the liabilities of several public pension funds greatly exceeded their assets. At the time of the Constitutional Convention, the Committee on Finance and Taxation estimated that it would require nearly $600 million to make the two public school employees retirement systems actuarially sound. See 1 Official Record, Constitutional Convention 1961, p 771. Thus, "many pensioners had accumulated years of service for which insufficient money had been set aside in the pension reserve funds to pay the benefits to which their years of service entitled them." *Kosa v State Treasurer*, 408 Mich 356, 365; 292 NW2d 452 (1980).

Failing to fund pension benefits at the time they are earned amounts to borrowing against future budgets, or "back door" spending. Cf. 1 Official Record, Constitutional Convention 1961, pp 772-773. "Back door" spending was the term used by the delegates to refer to the process of establishing pensions without paying the costs at the same time. The delegates intended to prevent this:[9]

> In other words, they should put enough money in there so when they retire the money is there. And there was a very specific purpose for this. I was one of the ones that pushed it. I wanted employers, legislative bodies and city councils to be very aware of what they were spending when they gave a person, a public employee, a retire-

---

[9] See also the remark of delegate Van Dusen:

We believe that this constitution must be a forward looking document; that it must take cognizance of the problem; that it must spell out for the future the manner in which these funds should be managed, so that our children will not, 50 years hence, suffer from the fact that we failed to put in enough money to take care of the benefits attendant upon the service currently performed by public employees. [1 Official Record, Constitutional Convention 1961, p 771.]

ment program. In other words, how much did it
cost per year?

> . . . [F]rom now on any governmental body can-
> not avoid paying for a retirement fund that they
> promise an employee. They've got to make those
> payments annually, on time. [1 Official Record,
> Constitutional Convention 1961, p 772 (delegate
> Stafseth).]

See also *Jurva v Attorney General,* 419 Mich 209,
224-225; 351 NW2d 813 (1984) ("the purpose of the
provision was to prevent the shifting of the burden
for pensions from the taxpayers who derived ben-
efit from the services rendered to future taxpayers
by 'back door' spending").

For the purpose of securing pension benefits and
preventing "back door spending," failing to pre-
fund retirement health care benefits is no different
from failing to prefund monthly retirement allow-
ances—a practice that defendants concede is pro-
hibited.[10] In both cases, the cost of the benefit
either must be paid as the benefits are earned by
the taxpayers who are receiving the direct benefits
from the services, or it must be paid as the bene-
fits come due by taxpayers who have received no
direct benefit from the services. The constitution
requires that benefits be funded as they are
earned. Therefore, because the purpose of the
provision is to prevent governmental units from
amassing bills for pension payments that they do
not have money to pay, we hold that the term
"financial benefits" must include retirement
health care benefits.

Defendants argue that the framers and ratifiers
of Const 1963, art 9, § 24 could not have had
health benefits in mind when they adopted the
provision, because state retirement systems did not

---

[10] See p 519.

pay for employee health care benefits until roughly a decade after adoption of the Constitution of 1963. The defendants' only evidence for this proposition, however, is that "[h]ealth benefits were not provided at all *under the teacher's retirement act* until 1974." This fact does not show either that health care benefits were not part of retirement plans during the early 1960's or that the drafters of the provision did not contemplate that health care benefits might fall within the provision some day.

Whether or not they were funded by the state, health care benefits appear to have increasingly been a part of retirement plans across the nation at the time this provision was drafted and adopted. See Kleinmann, *Fringe benefits for public school personnel* (Bureau of Publications, Teacher's College, Columbia University: New York, 1962), p 20. Michigan residents in particular would have been aware of the possibility that retirees might receive health care benefits. On January 1, 1962, approximately one month before the delegates discussed the proposal that was to become Const 1963, art 9, § 24, Chrysler Corporation began providing health insurance for its retirees and their eligible dependents on a split pay basis.[11]

Moreover, even assuming that the possibility that retirement health care benefits would become part of pension plans did not occur to all or some of the framers of Const 1963, art 9, § 24, the scope of the provision is not necessarily limited by the specific benefits they actually thought of. The very idea behind formulating a general rule, as opposed to a set of specific commands, is that a rule governs possibilities that could not have been anticipated at the time. Given that the justification for

[11] Source: Universal Standard Managed Care, Inc.

applying this rule to monthly retirement allow-
ances is equally applicable to health care benefits,
it seems fair to say that prefunding of health care
benefits is what the framers intended.

Defendants also point to definitions in other
legal sources that distinguish health care benefits
from monthly living allowances in the form of
cash payments. Under ERISA, for example, the
term "accrued benefit" does not include ancillary
benefits such as payment of medical expenses or
insurance. See 26 CFR, part 1, 1.411(a)-7(a)(1),
(c)(3). There is simply no reason to assume that a
word or phrase carries the same meaning when-
ever it appears regardless of the context. Health
care benefits are not "accrued benefits" under
ERISA because ERISA is intended to insure prefund-
ing only of retirement allowances. The distinction
between health care benefits and monthly retire-
ment allowances merely reflects the congressional
policy determination that "vesting of these ancil-
lary benefits would seriously complicate the ad-
ministration and increase the cost of plans whose
primary function is to provide retirement income."
*Sutton v Weirton Steel Div of Nat'l Steel Corp,*
724 F2d 406, 410 (CA 4, 1983).

### B. AMENDMENT OF THE STATUTE REQUIRING
### PREFUNDING DOES NOT CURE THE PROBLEM

Defendants argue that the constitution permits
amendment of 1985 PA 91, § 41(2), the statute that
provides for prefunding retirement health care
benefits, because appropriations by one Legislature
do not bind succeeding Legislatures. See, e.g., *Oak-
land Schools Bd of Ed v Superintendent of Public
Instruction,* 392 Mich 613; 221 NW2d 345 (1974).
While we agree with the proposition advanced, the
argument is misplaced.

The prefunding requirements of Const 1963, art 9, § 24 apply to pension benefits that must be paid.[12] The only alternative, leaving the bill for yet a future Legislature, exacerbates the problem. Unlike emergency cuts of nearly any other type of service, cuts of pension funds must be directly repaid, and at a much higher cost.[13]

The obligation to pay retirement health care benefits does not arise from the appropriations statutes. It is a contractual right arising from the fact that employees have worked in reliance on the statutory promise that the board will pay earned health care benefits of any member receiving a retirement allowance.

Moreover, as a practical matter, pension obligations differ from nearly every other type of government spending insofar as they simply cannot be reduced or cut. Leaving aside the desirability of such choices, it would be possible for the government to stop funding many of the projects it now plans to pay for. For example, if the Legislature had passed a statute saying that it would fund highway improvement for the next five years, it

---

[12] Many delegates to the 1961 Constitutional Convention perceived as unfair the rule that pensions granted by public authorities were not contractual obligations, but rather gratuitous allowances that could be revoked at will. See, generally, *Advisory Opinion re Constitutionality of 1972 PA 258,* 389 Mich 659, 662; 209 NW2d 200 (1973). This rule, to which Michigan subscribed at the time, enabled governmental units to reduce, or even terminate pension benefits after the employees had completed their employment and began receiving benefits. See, e.g., *Brown v Highland Park,* 320 Mich 108; 30 NW2d 798 (1948) (affirming the reduction of the plaintiff retiree's pension payments under the new city charter); *Van Coppenolle v Detroit,* 313 Mich 580; 21 NW2d 903 (1946) (affirming the city's termination of the plaintiff decedent's pension payments after he was indicted on gambling charges).

[13] Every year that the state fails to prefund this obligation could raise the real cost to the state approximately six to eight percent on the assumption that the economy, and thus the tax base, grows at an average rate of two to three percent annually, whereas the invested money, had it been prefunded, would have grown at an average rate of nine to ten percent.

could choose to cease funding highway expansion and repair in any given year. The state would not get wider highways that year, and traffic congestion would probably increase, but the state could pay this price if it needed to save the money. Similarly, the state could reduce the appropriation for its police force. Local communities previously benefiting from state police protection would either receive less police protection, divert local revenues from other sources, or seek new revenues.

Michigan governmental units do not have the option, however, of not paying retirement benefits. Unlike highway construction or police protection, which a governmental unit can choose to receive less of, it is impossible to receive less service from the pensioner. The pension is payment for work already completed, or deferred compensation.[14] See, for example, *Jacoby v Grays Harbor Chair & Mfg Co,* 77 Wash 2d 911, 915; 468 P2d 666 (1970),[15] and *Hoefel v Atlas Tack Corp,* 581 F2d 1, 5 (CA 1, 1978) (applying Massachusetts law) and authorities cited therein.

---

[14] When responsibility for funding retirement health benefits of public school employees was first assumed by the state, payment of these benefits was contingent on a yearly appropriation. See 1974 PA 244. Under that system, workers could not accrue health care benefits because there was no promise that the state would provide health care benefits when they retired, and thus it was unnecessary to prefund benefits. Under the present system, however, employees have worked in reliance on the state's unconditional promise that it will pay for retirement health care benefits for, among others, any member who is "60 years of age or older and has accumulated 10 or more years of credited service as a public school employee." MCL 38.1381; MSA 15.893(191).

[15] Citing cases from several jurisdictions, the Washington Supreme Court summarized the rule as follows:

A retirement pension is pay withheld to induce continued faithful service. It amounts to delayed compensation for services rendered.

III

## THE GOVERNOR'S EMERGENCY BUDGET
## CUTTING POWERS

Defendants also suggest that the executive orders that require funding on a cash disbursement basis do not violate the constitution because they comply with Const 1963, art 5, § 20. That provision[16] allows the Governor, with approval of the appropriations committees of both houses, to "reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based." The only restriction is that "[t]he governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes."[17] No constitutionally dedicated funds were disturbed by the executive orders in question. During fiscal year 1990-91, for example, only 55.7 percent of the $3.145 billion school aid fund, from which the retirement health care benefits were paid, was from sales tax revenue constitutionally dedicated to the school aid fund by Const 1963, art 9, § 11.[18]

We agree with the defendants that Const 1963, art 5, § 20 "was intended to give the Governor broad power to reduce expenditures in many areas." *Michigan Ass'n of Cos v Dep't of Management & Budget,* 418 Mich 667, 684; 345 NW2d 584

[16] See p 506, n 2.

[17] The Michigan Constitution of 1963 dedicates certain sources of revenue to specific purposes. See, e.g., art 9, § 9 (dedicating taxes imposed on fuels used for motor vehicles and aircraft to be "used exclusively for transportation purposes as set forth in this section").

[18] We also reject the plaintiffs' argument that the Governor's executive orders violated art 5, § 20 on the ground that the entire school aid fund, including the portion coming from the general fund is "constitutionally dedicated for [a] specific purpose[ ]."

(1984). In addition, we agree that education has not been immunized from emergency reductions. We also agree that Const 1963, art 9, § 24, is not a self-executing appropriation that constitutionally dedicates funds to state pension reserves. It does not follow from any of this, however, that Const 1963, art 5, § 20 empowers the Governor to reduce expenditures in a way that violates another provision of the constitution. It certainly would not authorize the government to refuse to satisfy its contractual obligations,[19] such as pension payments to retirees, in an emergency.

Defendants do not argue that Const 1963, art 5, § 20 would authorize the Governor to fail to prefund monthly retirement allowances (as opposed to retirement health care benefits). Rather, the defendants concede that prefunding of monthly retirement allowances is "constitutionally commanded" under Const 1963, art 9, § 24. Our conclusion is simply that health care benefits are "financial benefits" within the meaning of Const 1963, art 9, § 24, and consequently fall within the obligation that the defendants acknowledge.

Defendants point to the fact that the 1985 Legislature, which initially promised retirement health care benefits, did not have to balance the state budget in fiscal years 1990-91 and 1991-92. We appreciate that prefunding benefits promised by a previous Legislature can cause the state financial hardship. This seems to have been appreciated by the framers as well, who intended that governmental units would have to prefund benefits despite the temporary financial difficulty that would cause:

*Mr. Van Dusen:* Mr. Chairman and Mr. Gover,

---

[19] Defendants concede that retirement health care benefits are contractual benefits subject to Const 1963, art 1, § 10.

it is designed to prevent cities from in the future using the funds which are put into a pension fund to take care of current service benefits for any other purpose. If a city has become addicted to this practice, I would think the discontinuance of the habit might be a difficult experience for the city, at least briefly. It shouldn't hurt, however, too much. (laughter)

*Mr. Gover:* Just what do you mean by not hurting too much?

*Mr. Van Dusen:* I think I can give a clearer answer to Mr. Gover's question than I did. This is designed to see that money that is put into a pension fund to service currently accruing benefits is used for no other purpose. Any city that has been putting it in with one hand and taking it out with the other [to pay unfunded accrued liabilities] has got to stop. And if that hurts, why, it hurts. [1 Official Record, Constitutional Convention 1961, p 775.]

Finally, defendants assert that funding of pension health care benefits on a cash disbursement basis does not run afoul of the constitution because it is only temporary. "This issue is significantly different from the question whether, under Const 1963, art 9, § 24, ¶ 2, funding for health benefits under 1980 PA 300, § 41(2) may be *permanently* returned to cash disbursement funding, through legislative amendment . . . . That precise issue is *not* before this Court . . . ."[20]

We see no indication, however, either that the failure to prefund is temporary, or that Const 1963, art 5, § 20 provides the Governor authority

[20] The defendants' suggestion that temporarily funding retirement health benefits on a cash disbursement basis might be constitutional even if permanently doing so violates art 9, § 24 implicitly undermines their primary argument—that Const 1963, art 9, § 24 does not apply because retirement health care benefits are not "financial benefits." If that is the case, then the government has no duty to prefund them, and it makes no conceivable difference whether funding on a cash disbursement basis is temporary or permanent.

to violate other constitutional provisions even temporarily. Insofar as it authorizes the Governor to select and implement spending cuts in an emergency, it simply affords him legislative power. But the Legislature does not have authority to fail to prefund a pension fund, even temporarily.

## IV

### RELIEF

The plaintiffs request a writ of mandamus ordering the appropriate official to transfer funds from the school aid fund to the reserve for health benefits.[21] We agree with the Court of Appeals that under these circumstances we do not have authority to grant that relief.

To obtain a writ of mandamus, the plaintiff must have a clear legal right to the performance of the specific duty sought to be compelled, and the defendants must have a clear legal duty to perform the same. *Pillon v Attorney General,* 345 Mich 536, 539; 77 NW2d 257 (1956); *Janigian v Dearborn,* 336 Mich 261, 264; 57 NW2d 876 (1953). Mandamus is an extraordinary remedy that may lie to compel the exercise of discretion, but not to compel its exercise in a particular manner. *Teasel v Dep't of Mental Health,* 419 Mich 390, 409-410; 355 NW2d 75 (1984).

---

[21] The plaintiffs have requested that this Court

> [i]ssue orders, including a writ of mandamus, directing the appropriate state officials to transfer such monies from the State School Aid Fund to the Michigan Public School Employees Retirement System so that the state's obligation to fund said Retirement System pursuant to art 9, § 24 will be legally and properly filled.

The request in *Musselman II* is identical except it requests "including writs of mandamus *and any other orders necessary*" (emphasis added).

Given that the plaintiffs have failed to show that there is a pool of funds available to be transferred to the reserve for health benefits, the requested relief necessarily involves funds from the state treasury.[22] The only defendant with authority to appropriate funds[23] from the treasury is the Legislature. See *Detroit Bd of Ed v Superintendent of Public Instruction,* 319 Mich 436, 453; 29 NW2d 902 (1947). "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." Const 1963, art 9, § 17.

In this context, this Court lacks the power to require the Legislature to appropriate funds. This was the understanding of the drafters of art 9, § 24, who likewise did not contemplate that the prefunding requirement could be enforced by a court. They expected that the decision to comply rested ultimately with the Legislature, whom the people would have to trust:

> It is the intention that we will put in each year enough in every fund to take care of the liability occurring during that year, so it will not go farther and farther behind.
> . . . [But] there is no way to compel the legislature to appropriate money. There is no way that I

---

[22] Plaintiffs also request that this Court find that the Executive Orders in question, including Executive Order No. 1991-17, are "illegal and void." Formal declaratory relief, however, is beyond the scope of the plaintiffs' action, an original action in the Court of Appeals.

Moreover, the validity of these executive orders has no bearing on the critical issue—the plaintiffs request for mandamus. Even if Executive Order No. 1991-17, which reduced funds to the Public School Employees Retirement System was void, plaintiffs have not demonstrated that there is a fund outside the state treasury available to be transferred to MPSERS health benefits fund. In other words, granting mandamus relief to the plaintiffs would necessarily entail appropriating money from the state treasury.

[23] Compare *City of Adrian v Michigan,* 420 Mich 554; 362 NW2d 708 (1984) (holding that a Court of Claims judgment in favor of the City of Adrian would not compel either an appropriation or the payment of unappropriated funds).

know of to compel a city council to raise more money. We have to put some faith in somebody, and this is being put in the legislature. [1 Official Record, Constitutional Convention 1961, p 773 (delegate Brake).]

In other words, insofar as the plaintiffs are asking us to require the Legislature to appropriate funds for retirement health care benefits, we understand that the intention of the drafters was that the second sentence of Const 1963, art 9, § 24 is not self-executing. Because the provision does not alter the rule that legislative action is necessary to appropriate funds, it fails to " 'lay[ ] down rules by means of which [its] principles may be given the force of law.' "[24]

We do not wish to imply that courts lack either power or authority to prevent the state from using money held in reserve for pension payments to pay for unfunded accrued liabilities. Insofar as it is merely a prohibition, Const 1963, art 9, § 24 is self-executing. As a general rule, no legislation is necessary to give effect to a prohibition. See, e.g., *Beecher v Baldy,* 7 Mich 488, 500 (1859) (CHRISTIANCY, J.). Although lacking power in the instant case to order the state to appropriate money, it is at least clear that a court can prevent the appropriate state officer with a clear legal duty

---

[24] *Davis v Burke,* 179 US 399, 403; 21 S Ct 210; 45 L Ed 249 (1900) (quoting Cooley, Constitutional Limitations, p 99):

"A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law. Thus, a constitution may very clearly require county and town government; but if it fails to indicate its range, and to provide proper machinery, it is not in this particular self-executing, and legislation is essential."

to retain funds from violating that duty "apply-[ing] funded reserves to meet unfunded retirement obligations." *Kosa, supra,* 408 Mich 382.

CONCLUSION

It has been neither argued nor established that art 5, § 20 permits the Governor or Legislature to decline to prefund the benefits contemplated by art 9, § 24. We hold that the state is obligated to prefund health care benefits under art 9, § 24. However, because we have no authority to order the Governor or the Legislature to appropriate funds, mandamus is denied.

BRICKLEY, C.J., and CAVANAGH and MALLETT, JJ., concurred with BOYLE, J.

RILEY, J. (*concurring in part and dissenting in part*). The dispositive issue presented in this case is the proper method for funding health care benefits in the Michigan Public School Employees Retirement System. The majority finds that this Court does not have the power to grant plaintiffs mandamus even though the Governor's failure to prefund these benefits violates Const 1963, art 9, § 24. Although I agree with the majority's result that plaintiffs will not be able to recover, I disagree with its reasoning. Const 1963, art 9, § 24 requires that only financial benefits be prefunded. It is my belief that health care benefits do not equal financial benefits. This belief is based on my conclusion that health care benefits simply do not fall under the definitional umbrella of financial benefits. Consequently, I conclude that the Governor did not violate the constitution by failing to prefund these health care benefits and for this reason I believe that plaintiffs should be denied relief.

I

The key to determining whether Governor Engler violated the constitution through his actions turns on how one defines a financial benefit. Const 1963, art 9, § 24 provides in relevant part:

The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

Through this provision, the constitution establishes a contractual obligation requiring the state to fund financial benefits in a given year as they arise. If the aforementioned health benefits are financial benefits, then they have to be funded and the Governor's acts preventing such funding were unconstitutional. However, if these health benefits do not fall under the penumbra of financial benefits, then they are not constitutionally dedicated and the Governor's failure to prefund them is not unconstitutional, provided that he had the power to cut the budget in this manner.

The majority maintains that health benefits are equal to financial benefits and begins by viewing the issue from the perspective of the employee. The majority argues that for the employee these health benefits may not represent cash in hand but they do have a definite cash value. "Although health insurance is not cash that retirants may spend as they wish, employees receive health insurance in lieu of additional compensation, and

they would have to purchase insurance if it were not provided to them." *Ante,* p 511.

The majority concludes that examining this issue through the eyes of the employee· will not answer the question whether health benefits are equal to financial benefits. "This analysis tends to show that retirement health care benefits are financial benefits, but the fact that it does not yield a conclusive answer indicates that this point of view is likely the wrong one." *Id.*

Thus, the majority concludes that the issue should be viewed from the government's perspective and arrives at the conclusion that financial benefits are equal to health benefits. "Instead, the proper perspective from which to interpret the term 'financial benefits' seems to be that of the government." *Id.* The majority carefully examines the history behind this provision and concludes that the reason for its existence is to protect the pension fund. "Therefore, because the purpose of the provision is to prevent governmental units from amassing bills for pension payments that they do not have money to pay, we hold that the term 'financial benefits' must include retirement health care benefits." *Id.,* p 513.

The majority's ultimate conclusion, however, misses the mark because when interpreting the language of the constitution, unambiguous terms are given their plain meaning.

> The constitution, although drawn up by a convention, derives no vitality from its framers, but depends for its force entirely upon the popular vote. Being designed for the popular judgment, and owing its existence to the popular approval, its language must receive such a construction as is most consistent with plain, common sense . . . . [*People ex rel Twitchell v Blodgett,* 13 Mich 127, 141 (1865).]

The normal usage of the word "financial"[1] connotes money and "money"[2] connotes some form of hard currency that can be "spent."

The financial world shares a similar interpretation of this term. In an article appearing in the National Mortgage News on January 14, 1991, a definition of a financial instrument appeared that is directly relevant. In this article, a proposal by the Financial Accounting Standards Board, which creates guidelines for general accounting principles, was discussed. Specifically, the proposal required "financial institutions to report the current value of all 'financial instruments' in their portfolios." "FASB Opts for Current Value Reports," National Mortgage News, January 14, 1991, p 8. Moreover, it is interesting to note that "[t]he FASB proposal *excludes* pension benefits, leases, insurance policies and similar items from its definition of financial instruments." *Id.* at 9 (emphasis added). Hence, if the FASB does not consider pension benefits and insurance policies to fall under the definition of a financial instrument, it is not a large leap to conclude that health insurance benefits included in a pension plan are not financial instruments and hence are not financial benefits.

This conclusion by the FASB, although not con-

---

[1]  1. pertaining to monetary receipts and expenditures; pertaining or relating to money matters; pecuniary. 2. of or pertaining to those commonly engaged in dealing with money and credit. . . . [*Random House Webster's College Dictionary.*]

[2]  1. any circulating medium of exchange, including coins, paper money, and demand deposits. 2. paper money. 3. gold, silver or other metal in pieces of convenient form stamped by public authority and issued as a medium of exchange and measure of value. 4. any article or substance used as a medium of exchange, means of payment, or measure of wealth, as checks on demand deposit. 5. a particular form or denomination of currency. See table at currency . . . . [*Random House Webster's College Dictionary.*]

trolling, sheds a great deal of light on the proper interpretation of the term "financial benefit." However, even more illuminating is the case of *Port Huron Area School Dist v Port Huron Ed Ass'n,* 120 Mich App 112, 116; 327 NW2d 413 (1982). In that case, the Court of Appeals interpreted the term "financial resource" as including funds, assets, and expected revenues. "We hold that the term 'financial resources' means the funds-assets, expected revenues, etc.—available for expenditure by the [district] in a given year." The reference in this definition to funds, assets, and expected revenues once again demonstrates that the term "financial" is understood to involve actual money. Consequently, it is difficult to find that a health benefit is a financial benefit.

This conclusion finds further support in the fact that even money does not always equal a financial benefit. In *Jurva v Attorney General,* 419 Mich 209, 224; 351 NW2d 813 (1984), this Court found that cash payments as an incentive for early retirement did not constitute financial benefits. "We find, therefore, that early retirement incentives are not 'financial benefits arising on account of service rendered' and that Const 1963, art 9, § 24 is inapplicable."

While the majority does attempt to substantiate its. conclusion that health benefits are equal to financial benefits by looking to the intent of the framers of the provision, such an examination is improper because, as stated by Justice COOLEY in *Blodgett,* "the light to be derived from an examination of the proceedings of constitutional conventions, on questions of constitutional construction, is commonly vague and inconclusive, and not to be allowed, in any case, to control the meaning of unambiguous terms." *Id.* at 166. He further stated:

If, however, by an examination of these proceedings, we had succeeded in ascertaining definitely the intent of the convention, we might still be far from the intent of the people in adopting their work. That intent should be gathered from the words embraced by the instrument as adopted, if those words are free from doubt. The people, in passing upon it, looked only to the clauses as they then stood, without troubling themselves with the considerations, or the accidental circumstances, that may have brought them to their present form. [*Id.* at 166-167.]

Justice COOLEY then concluded that if the constitution expresses a natural meaning which, upon

the first impression . . . strike[s] the mind on reading the clause . . . then further examination, with a view to find some other and more subtle meaning, ought to be made with extreme caution, lest we deceive ourselves into disregarding the plain and obvious sense for some other, which only ingenuity discovers and suggests. [*Id.* at 167.]

Because the term "financial" has a commonly understood meaning, there is no need to look to the framers' intent behind the provision. Thus, I believe that the majority's analysis regarding the purpose behind the provision is improper.

Furthermore, it is questionable whether the framers even intended that financial benefits equal health benefits. The legislative history indicates that the term originally recommended for this provision by the advisory committee was "benefit," which has a broad connotation.

The committee recommends that the following be included in the constitution:

Sec. a. The accrued financial benefits of each pension plan and retirement system of the state

and its political subdivisions shall be a contractual obligation thereof, which shall not be diminished or impaired thereby.

All such *benefits* arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be usable for financing unfunded accrued liabilities. [1 Official Record, Constitutional Convention 1961, p 770. Emphasis added.]

However, in the final draft, the framers limited the term "benefit" by adding the word "financial."

*Financial benefits* arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities. [Const 1963, art 9, § 24. Emphasis added.]

Hence, the problem with the majority's conclusion is that the framers' creation specifically classifies the type of benefit protected as financial. The framers had every opportunity to use the broader solitary term "benefit" when it was recommended in that form, but chose not to do so. This fact leads to the inevitable conclusion that the framers actually intended to limit the definitional umbrella of "benefit" by narrowing it with the use of the term "financial." In fact, when the vote was taken on April 19, 1962, the proposal that included the term "financial benefit" was overwhelmingly approved with 117 yeas and only 1 nay. 2 Official Record, Constitutional Convention 1961, p 2659. Consequently, even if we look at the legislative history behind the provision, we come to the realization that the framers wanted a narrower meaning for the term "benefit."

This conclusion makes perfect sense in light of the principle of ejusdem generis, a rule of statu-

tory construction that is applied where there are general terms modified by more specific terms.

> "The rule 'accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words.'
>
> "The resolution of this conflict by allowing the specific words to identify the class and by restricting the meaning of general words to things within the class is justified on the ground that had the legislature intended the general words to be used in their unrestricted sense, it would have made no mention of the particular words." [*Belanger v Warren Bd of Ed,* 432 Mich 575, 583-584; 443 NW2d 372 (1989), quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.17, p 166.]

This rule of interpretation is directly applicable in this case because the rules for interpreting statutes are essentially the same as the rules for interpreting the constitution. See *Tucker v Ferguson,* 89 US (22 Wall) 527; 22 L Ed 805 (1874). The specific word chosen, "financial," identifies the class restricting the meaning of the general word "benefit" to that class, "financial benefits." If the framers had wanted the term "benefit" to be used in a broad sense, they would not have used the term "financial" to limit it. Here the framers had a chance to limit the term to only "benefit," and actually made that recommendation, but, in the end, the limiting term "financial" appeared. Consequently, because a court "should not, without clear and cogent reason to the contrary, give a statute a construction the legislature itself plainly refused to give," *People v Adamowski,* 340 Mich 422, 429; 65 NW2d 753 (1954), it only makes sense that we

should not extend to the term "benefit" a broader meaning that the framers clearly rejected.

II

THE GOVERNOR'S BUDGET CUTTING POWERS
UNDER CONST 1963, ART 5, § 20

Under Const 1963, art 5, § 20, the Governor is allowed to "reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based." This provision obviously grants to the Governor vast budget cutting powers. *Michigan Ass'n of Cos v Dep't of Management & Budget,* 418 Mich 667, 684; 345 NW2d 584 (1984). However, it is true that "[t]he governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes." Const 1963, art 5, § 20. The majority concludes that because health benefits are equal to financial benefits, they are constitutionally dedicated and cannot be cut by the Governor. "Our conclusion is simply that health care benefits are 'financial benefits' within the meaning of Const 1963, art 9, § 24, and consequently fall within the obligation that the defendants acknowledge." *Ante,* p 519. The majority's conclusion, however, as stated earlier, is incorrect. Health benefits are not equal to financial benefits; consequently, they are not constitutionally dedicated under Const 1963, art 9, § 24 and can be cut through the Governor's budget-cutting powers granted to him by Const 1963, art 5, § 20.

III

CONCLUSION

The result reached by the majority is the correct

one. The defendants should prevail, but not for the reasons articulated by the majority. Financial benefits simply do not include health benefits for purposes of Const 1963, art 9, § 24. As a result, these funds were not constitutionally dedicated under Const 1963, art 9, § 24 and could be cut by the Governor's budget-cutting powers granted to him under Const 1963, art 5, § 20. The defendants did not violate the constitution and should prevail. Because of my resolution of this issue, it is unnecessary to address the mandamus issue.

LEVIN, J., concurred with RILEY, J.

WEAVER, J., took no part in the decision of this case.